District Court
District of Connecticut
FILED AT NEW HAVEN

May 1 _____ 20 23

By __S. Santos_____
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| IN THE MATTER OF APPLICATIONS FOR SEARCH WARRANTS | Case No.  3:23-mj-413 (MEG) |
| --- | --- |
| | **May 1. 2023** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATIONS

I, Ryan Halpin, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I submit this affidavit in support of an application for a search warrant, pursuant to Federal Rule of Criminal Procedure 41, authorizing the examination of an electronic device currently in the custody of law enforcement, described in Attachment A-1, as well as the extraction from that property of electronically stored information described in Attachment B-1. In addition, I submit this affidavit in support of an application to search 36 Assumption Street in New Haven, Connecticut, more particularly described in Attachment A-2,  for the cellular device belonging to Markos PAPPAS, and authorizing the examination of that cellular device, as well as the extraction from that property of electronically stored information described in Attachment B-2.

2.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18 of the United States Code.  I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and authorized by the Attorney General to request a search warrant. I have been employed as a Special Agent with the FBI since August 2019.  I attended the Basic Field Training Course at the FBI Academy in Quantico, Virginia.  I am currently assigned

to the New Haven Division of the FBI, where I have been tasked with investigating violent criminal street gangs and organized criminal enterprises involving the smuggling, distribution, and sale of illegal drugs.  Prior to becoming an FBI Special Agent, I was a police officer for seven years. As a police officer, I investigated numerous crimes, including drug dealing/distribution and firearms-related offenses.

3.      In connection with these investigations, I have coordinated controlled purchases of illegal drugs utilizing cooperating sources; conducted electronic and physical surveillance of individuals involved in organized criminal activity; analyzed records documenting the purchase and sale of illegal drugs and other items; and debriefed cooperating sources and drug distributors, as well as other local, state and federal law enforcement officers, regarding the manner and means employed by organized criminal enterprises.

4.      I have participated in previous Title III investigations, including by monitoring intercepted communications, completing extensive toll analysis, and conducting physical and electronic surveillance of investigative targets.

5.      Based on my training and experience, I know that narcotics traffickers often use cellular telephones and often speak to one another using coded, cryptic or slang words and phrases, in the belief that, by doing so, they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets.  From my experience, I am familiar with many of the codes, words and phrases that are frequently used by drug traffickers in the acquisition and distribution of narcotics.  I know that drug traffickers frequently have access to several cellular telephones, and that they periodically use newly acquired cellular telephones.  I also know that narcotics traffickers and distributors frequently use cellular telephones subscribed to by other persons and prepaid cellular telephones that require the purchaser to provide little or no identifying

information to purchase, activate, and utilize, all of which is done in an effort to avoid detection and thwart the efforts of law enforcement.  I know, based upon my training and experience, that narcotics traffickers and distributors often segregate various aspects of their illicit business, and use different telephones when tending to each of the various aspects, in an effort to thwart law enforcement and insulate themselves and their confederates.  For example, drug dealers often use one telephone to contact customers and another to contact their narcotic source(s) of supply.

6.     The facts in this affidavit come from my own personal knowledge from participating in this investigation and my training and experience, and from information obtained by me from other law enforcement personnel.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not set forth all of my knowledge about this matter.  It sets forth only those facts necessary to support the requested authorization.

7.     As discussed herein, the FBI and the Drug Enforcement Administration (DEA) are investigating Willis Taylor, Aquarius GUMBS, Markos PAPPAS, and others in connection with the manufacturing and distribution of wholesale quantities of counterfeit oxycodone tablets (containing fentanyl) and counterfeit Adderall tablets (containing methamphetamine) in and around New Haven, Connecticut, along with the distribution of other controlled substances, including cocaine. A wiretap phase of this investigation began in or about June 2022.  The Court (the Hon. Kari A. Dooley, U.S. District Judge) authorized the interception of communications over a number of Target Telephones in this case.  As relevant to this affidavit, wire and/or electronic communications were intercepted over:

- Target Telephone 1 (telephone number 203-530-0242, wire and electronic communications), used by WILLIS TAYLOR, from approximately June 15, 2022, through July 15, 2022; August 3, 2022, through August 31, 2022; and October 6, 2022, through November 4, 2022;

- Target Telephone 2 (telephone number 203-506-5734, wire communications only), used by SEAN PEPE, from approximately June 15, 2022, through July 15, 2022;

- Target Telephone 3 (telephone number 203-836-6835, wire and electronic communications), used by AQUARIUS GUMBS, from approximately August 4, 2022 through August 31, 2022 and October 6, 2022 through No6vember 4, 2022.

- Target Telephone 4 (**Device 1, Attachment A-1**) (telephone number 203-800-5346, wire and electronic communications), used by AQUARIUS GUMBS, from approximately August 3, 2022, through August 31, 2022; and October 6, 2022, through November 4, 2022;

- Target Telephone 5 (telephone number 203-850-2207, wire and electronic communications), used by GORDON LAURIA, from approximately August 3, 2022, through August 31, 2022.

- Target Telephone 6 (**Device 2, Attachment A-2**) (telephone number 646-889-3523, wire and electronic communications), used by MARKOS PAPPAS, from approximately October 6, 2022, through November 4, 2022; and January 12, 2023, through February 10, 2023.

As discussed below, I believe communications intercepted over the Target Telephones to be evidence of the drug trafficking by the users of the Target Devices and, therefore, that evidence of drug trafficking exist on the devices to be searched.[1]

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED (the "TARGET DEVICES")

8.    The first property to be searched, described in Attachment A-1, is a grey Apple iPhone cellular device with a cracked rear panel, Verizon carrier, unknown IMEI, ICCID 89148 00000 67755 22962, hereinafter referred to as "Device 1." Device 1 is currently located at the FBI New Haven Headquarters, 600 State Street in New Haven, Connecticut. It was seized from

---

[1] Transcriptions of some of these intercepted calls related to drug distribution are set forth herein. These transcriptions are in draft form. They were prepared, in most instances, by monitors who first overheard, and if necessary translated, the intercepted calls. The draft transcripts of intercepted communications are subject to revision. The same is true of draft transcriptions of consensually recorded conversations set forth herein.

AQUARIUS GUMBS on March 28, 2023 during his arrest on a federal criminal complaint in the matter 3:23mj260(RMS).

9.      The second property to be searched is 36 Assumption Street, New Haven, Connecticut, more particularly described in Attachment A-2, for a cellular telephone of unknown make and model, Verizon carrier, unknown IMEI, telephone number 646-889-3523, hereinafter referred to as "Device 2."

10.     Device 1 and Device 2 are collectively referred to herein as the "Target Devices."

11.     The applied-for warrants would authorize the forensic examination of the Target Devices for the purpose of identifying electronically stored data particularly described in Attachments B-1 and B-2.

## PROBABLE CAUSE

12.     The investigation to date has revealed that Willis Taylor coordinated the manufacturing of counterfeit Oxycodone pills (typically blue pills that, in fact, contain fentanyl) and counterfeit Adderall tablets (typically orange pills that contain methamphetamine) and distributed those drugs, along with cocaine, and other substances to a variety of redistributors. Willis Taylor was also believed to have processed drugs for MARKOS PAPPAS (Device 2). Interceptions and surveillance showed that Willis Taylor used AQUARIUS GUMBS (Device 1) as a source of supply in some these transactions. GUMBS was also intercepted selling quantities of controlled substances to his own customers.

13.     Following Willis Taylor's arrest in November of 2022 on State of Connecticut drug charges, the investigation revealed that PAPPAS appeared to be dealing with individuals other than Willis Taylor for drugs, likely concerned about TAYLOR's pending criminal charges. As

discussed below, investigators were able to identify a separate source of drugs for PAPPAS, identified as Lisa Fausel.

14.    On March 24, 2029, the Court, the Hon. Robert M. Spector, U.S.M.J., authorized the issuance of criminal complaints and arrest warrants charging Willis Taylor, AQUARIUS GUMBS, Lisa Fausel, MARKOS PAPPAS and others with various drug-related offenses under Title 21, United States Code. On March 28, 2029, these individuals were all arrested and made their initial appearance before this Court. The affidavit of DEA Special Agent Dana Mofenson in support of the criminal complaint applications is annexed hereto as Exhibit 1 and incorporated by reference (and docketed as Doc. 1-1 in 3:23mj257(RMS) for PAPPAS and 3:23mj262(RMS) for GUMBS.)

15.    On April 4, 2023, a grand jury returned a 14-count indictment charging these individuals with various drug (and for AQUARIUS, firearms) related offenses in the matter *United States v. Taylor et al.*, 3:23cr62(OAW).

***Device 1–Aquarius Gumbs***

16.    As set forth in Special Agent Mofenson's affidavit (Ex. 1, paras. 32-47), Willis Taylor used GUMBS as a source of cocaine.  GUMBS is the user of Device 1, which was Target Telephone 4 during the wiretap portion of the investigation.

17.    On the morning of GUMBS' arrest on March 28, 2023, two cellular devices were seized from GUMBS' nightstand. The two devices have now been conclusively identified as Device 1, and a second cellular telephone which was Target Telephone 3 during the wiretap investigation. On April 17, 2023, investigators sought and obtained a search warrant for this second device, which was turned on and successfully called by law enforcement on the morning of the arrest warrant execution. *See* 3:23mj362(MEG). Law enforcement officers also attempted to call

Target Telephone 4 (i.e., Device 1 in this current application) on the morning of the arrest, but did not see or hear any phones ring; however, Device 1, which was on GUMBS's nightstand, was observed to be powered off.

18.     Device 1 was seized for further investigation. The Integrated Circuit Card ID (ICCID) was obtained from the SIM card. The SIM card was identified as belonging to the provider Verizon wireless. On April 4, 2023, Verizon wireless was served with an administrative subpoena for ICCID 89148 00000 67755 22962, as located on the Device 1 SIM card. On April 14, 2023, Verizon returned a response indicating that ICCID belonged to "Aquarius Gumbs, Property Surgeons International, 130 Meloy Rd, West Haven, CT 06516," with telephone number 203-800-5346, which is consistent with the telephone number investigators know to be associated with Target Telephone 4 from the wiretap portion of the investigation.

19.     Updated toll records for Device 1 were requested on April 17, 2023 and received on April 28, 2023. The toll records show that Device 1 was in use (sending and receiving messages) through March 27, 2023. In addition, the toll records show that the records show that GUMBS had 48 contacts with an individual known to me with initials S.B. (last contact on March 19, 2023), who has not yet been charged in this case. S.B. had been intercepted over the wiretap requesting to meet GUMBS for "drinks," which I know was a code used by GUMBS to conduct drug transactions.  On March 22, 2023, investigators from the New Haven Police Department and the FBI served a State of Connecticut search warrant on S.B.'s business in New Haven. On S.B.'s person, officers found $1,440 in cash and a cellular telephone. Behind the counter of S.B.'s store, officers found and seized a total of 40.4 grams of a substance that field tested positive for fentanyl; a total of 16.5 grams of a substance that field tested positive for cocaine; a total of 2.3 pounds of suspected marijuana; eighteen (18) 8-milligram Suboxone patches; twelve (12) blue pills with

markings consistent with Oxycodone; and thirteen (13) blue pills with a different marking also consistent with Oxycodone.  Accordingly, there is reason to believe and I do believe that there will be evidence on Device 1 to confirm the wiretap communications set forth above, (and for all intercepted, pertinent conversations over Target Telephone 4) but also more recent communications between GUMBS and individuals like S.B.

20.     As noted above, the Device 1 was seized as evidence during the execution of several arrest warrants in this single investigation on March 28, 2023 and the investigation into that device has been ongoing since that time. I understand that on April 28, 2023, the Government contacted the Court for a date to present this application, which was then scheduled for May 1, 2023. As of the date of the signing of this affidavit, Mr. Gumbs has not requested the return of Device 1.

***Device 2 – Markos Pappas***

21.     As set forth in Special Agent Mofenson's affidavit (Ex. 1, paras. 32-47), Willis Taylor is believed to have processed drugs for PAPPAS. Additionally, Lisa Fausel was identified as a source of supply for PAPPAS. PAPPAS is the user of Device 2, which is identified above as Target Telephone 6 during the wiretap investigation.

22.     As detailed in Special Agent Mofenson's affidavit, on February 2, 2023, PAPPAS fled a traffic stop by Connecticut State Police (CSP) and was arrested by CSP shortly thereafter at the apartment complex where co-defendant Julio Echevarria lives. During his arrest, PAPPAS was in possession of a cellular device, which was confirmed *not* to be Device 2. At the time, investigators were wiretapping Device 2, which PAPPAS was talking on when he fled the traffic stop. Accordingly, investigators believed that PAPPAS had concealed Device 2 from law enforcement in between when he fled from the traffic stop and when he was ultimately arrested. According to Verizon, as of April 13, 2023, service to Device 2 was currently active.

23.     As explained above, on March 28, 2023, PAPPAS was arrested by federal authorities. Since that time, he has been detained at the Donald W. Wyatt Detention Facility pursuant to an Order of Detention issued by this Court, the Hon. Robert M. Spector, U.S.M.J. Investigators have issued Grand Jury subpoenas to the Wyatt facility for recorded, non-privileged telephone calls for PAPPAS. Calls received in response to the subpoenas show that PAPPAS is speaking with his girlfriend, Shamily Lecleres, who lives at PAPPAS' residence, 36 Assumption Street, where PAPPAS was arrested on March 28, 2023.

24.     The following voice call intercepts of PAPPAS' prison calls indicate that Lecleres is in possession of Device 2 at 36 Assumption Street:

- On March 30, 2023, via a prison call, PAPPAS requested that Lecleres go into "my phone," presumably Device 2, and instructed her to retrieve a telephone number and provide that number to another PAPPAS associate. The person whose number was supposed to be retrieved, was someone known to law enforcement based on there being numerous telephone interceptions involving that individual over Target Telephone 6 during the wiretap portion of the investigation.

- On April 4, 2023, via a prison call, PAPPAS told his sister, Cassandra Pappas that information regarding his business email account would be sent to his "phone," which Lecleres had in her possession. On the same date, PAPPAS instructed Lecleres to go into his phone and obtain a third party's telephone number.

- On April 5, 2023, PAPPAS again instructed Lecleres to obtain information from his phone, specifically to "Facetime," someone. Lecleres responded: "I don't know how to work that phone."

- On April 6, 2023, Lecleres told PAPPAS that "Jessica" keeps sending text messages to PAPPAS's phone.

- On April 12, 2023, Cassandra Pappas and Lecleres were on a video call with Pappas and Pappas instructed Cassandra to look up a contact in his phone. The video call shows what I recognize to be the interior of 36 Assumption Street based upon previous social media video posted by Lecleres and from body worn camera video of PAPPAS's arrest on March 28, 2023.

25.    Accordingly, permission is sought to search 36 Assumption Street for Device 2 and then to examine Device 2, as well as extract from Device 2 electronically stored information described in Attachment B-2.

## **TECHNICAL TERMS**

26.    Based on my training and experience, I use the following technical terms to convey the following meanings:

   o Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   o Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their

recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

o   Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

o   GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

27.     Based on my training and experience, as well as the manufacturer's advertisements and product technical specifications available online, I know that the Target Devices likely have capabilities that allow them to serve to as a wireless telephone, digital camera, portable media player, and GPS navigation device. Due to the exact model of each cellular telephone not identified without additional access to the device, the exact capabilities of the device are uncertain. In my

training and experience, examining data stored on device of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

28.     Based on my knowledge, training, and experience, and consultation with and information from other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

29.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Target Devices because:

- Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).
- Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

- A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

- The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual

information necessary to understand other evidence also falls within the scope of the warrant.

- Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

30.    *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Devices consistent with the warrant.  Examination of each Target Device may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

31.    *Manner of execution.*  As to Device 1, because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## <u>CONCLUSION</u>

32.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of Device 1, and for a search warrant authorizing the search of 36 Assumption Street in New Haven, Connecticut for Device 2 and the examination of Device 2.

Respectfully submitted,

RYAN
HALPIN

Digitally signed by RYAN
HALPIN
Date: 2023.05.01
12:19:21 -04'00'

Ryan Halpin
Special Agent
Federal Bureau of Investigation

The truth of the foregoing affidavit was attested to me by telephone by Special Agent

Ryan Halpin this 1st day of May 2023.

Maria E.
Garcia

Digitally signed by Maria
E. Garcia
Date: 2023.05.01
13:06:31 -04'00'

HON. MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

**<u>ATTACHMENT A-1</u>**
**Property to Be Searched**

A grey Apple iPhone cellular device with a cracked rear panel, Verizon carrier, unknown IMEI, ICCID 89148 00000 67755 22962, hereinafter referred to as "Device 1." Device 1 is currently located at the FBI New Haven Headquarters, 600 State Street in New Haven, Connecticut. It was seized from AQUARIUS GUMBS on March 28, 2023 during his arrest on a federal criminal complaint in the matter 3:23mj260.

**ATTACHMENT A-2**
**Property to Be Searched**
*36 Assumption Street, New Haven, Connecticut*



A raised ranch-style single family residence with white siding, solar panels on the roof and red shutters. According to the New Haven town records website, Vision Government Solutions, this residence is owned by Markos James Anthony Pappas and co-owned by Tassoula Nicolaou-Jones.

**ATTACHMENT B-1**
*Property to be Seized*

The following things are authorized to be seized from **Device 1** identified in Attachment A-1 as follows:

All records on **Device 1** that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Possession with Intent to Distribute Controlled Substances and Conspiracy to Possess with Intent to Distribute Controlled Substances) <u>for the time period of including August 1, 2022 to March 28, 2023</u>:

    a.  The telephone call number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with the Device;

    b.  Call logs and histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of the Device;

    c.  Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described offenses;

    d.  Records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

    e.  Information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

    f.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

    g.  Saved searches, locations, and route history in the memory of the Device; and

    h.  Internet browsing history, including internet searches in the memory of the Device.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**ATTACHMENT B-2**
*Property to Be Seized*

A cellular telephone with unknown make and model, Verizon carrier, unknown IMEI, telephone number 646-889-3523, hereinafter referred to as "Device 2."

The following things are authorized to be seized from Device 2 as follows:

All records on Device 2 that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Possession with Intent to Distribute Controlled Substances and Conspiracy to Possess with Intent to Distribute Controlled Substances) including, for the time period of October 1, 2022 through March 28, 2023:

        a.      The telephone call number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with the Device;

        b.      Call logs and histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of the Device;

        c.      Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described offenses;

        d.      Records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

        e.      Information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

f.      GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

g.      Saved searches, locations, and route history in the memory of the Device; and

h.      Internet browsing history, including internet searches in the memory of the Device.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

EXHIBIT 1

MAR 24 2023 AH 11: 45
FILED-USDC-CT-NEW HAVEN

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF APPLICATION FOR ARREST WARRANTS FOR WILLIS TAYLOR, et al., AND FOR A SEARCH WARRANT OF DAC | Case No.  23 - mj - 355 through  23 - mj - 369 RMS  **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS AND SEARCH WARRANTS

I, Dana Mofenson, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I am a Special Agent with the Drug Enforcement Administration (hereinafter, "DEA") and have been so employed since August 2004. I am currently assigned to the DEA New Haven District Office Tactical Diversion Squad. I have previously been assigned to the DEA Bridgeport Resident Office High Intensity Drug Task Force. I have prepared numerous affidavits in support of applications for federal search warrants and arrest warrants, as well as in support of authorizations to conduct electronic surveillance.  As a case agent, I have directed and coordinated electronic surveillance, controlled purchases of drugs, physical surveillance, and undercover activities, as well as debriefed and managed confidential sources.  I am familiar with the manner in which individuals obtain, finance, store, manufacture, transport, and distribute their illegal drugs.  I have a Bachelor of Arts and a Bachelor of Business Administration from the University of Massachusetts at Amherst and a Master of Science from Northeastern University.  I have completed the 16-week DEA Basic Agent Trainee academy in Quantico, Virginia.  I have also

attended numerous law enforcement training courses related to the field of drug law enforcement and routinely instruct other law enforcement officers on the topic of drug law enforcement.

3.    In connection with these investigations, I have coordinated controlled purchases of illegal drugs utilizing cooperating sources; conducted electronic and physical surveillance of individuals involved in organized criminal activity; analyzed records documenting the purchase and sale of illegal drugs and other items; and debriefed cooperating sources and drug distributors, as well as other local, state and federal law enforcement officers, regarding the manner and means employed by organized criminal enterprises. I have participated in previous Title III investigations, including by monitoring intercepted communications, completing extensive toll analysis, and conducting physical and electronic surveillance of investigative targets.

4.    I submit this affidavit in support of a criminal complaint and application for arrest warrants charging the following individuals with various narcotics and firearms charges, in violation of various Title 21 and Title 18 sections, as outlined below:

a.   WILLIS TAYLOR, for violating Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(vi), (b)(1)(A)(viii), (b)(1)(B)(i), (b)(1)(C), and 846 (Possession with Intent to Distribute and Distribution of More than 400 Grams of Fentanyl, More than 500 Grams of a Mixture and Substance Containing Methamphetamine, More than 100 Grams of Heroin, and a Quantity of Cocaine, and Conspiracy to Possess with the Intent to Distribute Controlled Substances)

b.   AQUARIUS GUMBS, also known as "Q," "Ice," and "Diamond," for violating Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and 846 (Possession with Intent to Distribute and Distribution of a Quantity of Fentanyl, Methamphetamine and Cocaine, and Conspiracy to Possess with the Intent to Distribute Controlled Substances); Title 18, United States Code, Section 922(g) (Felon in Possession of a Firearm); and Title 18, United States Code, Section 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime)

c.   SEAN PEPE for violating Title 21, United State Code, Sections 841(a)(1), (b)(1)(B)(vi), (b)(1)(C), and 846 (Possession with Intent to Distribute and Distribution of More than 40 Grams of Fentanyl and a Quantity of Methamphetamine and Cocaine, and Conspiracy to Possess with the Intent to

Distribute Controlled Substances); Title 18, United States Code, Section 922(g) (Felon in Possession of a Firearm); and Title 18, United States Code, Section 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime)

d. GORDON LAURIA for violating Title 21, United States Code, Section 846 (Conspiracy to Possess with the Intent to Distribute Controlled Substances)

e. PAUL PAOLELLA for violating Title 21, United States Code, Section 846 (Conspiracy to Possess with the Intent to Distribute Controlled Substances)

f. PETER ABLONDI TAYLOR for violating Title 21, United States Code, Section 846 (Conspiracy to Possess with the Intent to Distribute Controlled Substances)

g. MARK APOTRIAS for violating Title 21, United States Code, Sections 841(a)(1), (b)(1)(C) and 846 (Possession with Intent to Distribute Controlled Substances and Conspiracy to Possess with Intent to Distribute Controlled Substances)

h. THOMAS JOSLIN for violating Title 21, United States Code, Section 846 (Conspiracy to Possess with the Intent to Distribute Controlled Substances)

i. DAVID KING for violating Title 21, United States Code, Section 846 (Conspiracy to Possess with the Intent to Distribute Controlled Substances)

j. RICHARD GREATSINGER for violating Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), and 846 (Possession with Intent to Distribute Cocaine and Conspiracy to Possess with the Intent to Distribute Controlled Substances)

k. CHRISTOPHER CAHILL for violating Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), and 846 (Possession with Intent to Distribute Cocaine) and Conspiracy to Possess with the Intent to Distribute Controlled Substances)

l. MARKOS PAPPAS, also known as "Speedy," for violating Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B)(ii), and (b)(1)(C), and 846 (Possession with Intent to Distribute Controlled Substances and Conspiracy to Possess with the Intent to Distribute More than 500 Grams of Cocaine and Controlled Substances)

m. LISA FAUSEL for violating Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B)(vi), 841(b)(1)(B)(ii) and (b)(1)(C), and 846 (Possession with Intent to Distribute More than 40 Grams of Fentanyl and 500 Grams of Cocaine and Conspiracy to Possess with the Intent to Distribute Controlled Substances)

n. JULIO ECHEVARRIA, also known as "Warrior," for violating Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), and 846 (Conspiracy to Possess with Intent to Distribute Controlled Substances).

5.     In addition, I submit this affidavit in support of an application for a search warrant, pursuant to Federal Rule of Criminal Procedure 41, to search Discount Auto & Cycle, 376 Quinnipiac Avenue, New Haven, more particularly described in Attachment A, for evidence of Money Laundering (in violation of Title 18, United States Code, Section 1956) and for Possession with Intent to Distribute Controlled Substances and Conspiracy to Possess with Intent to Distribute Controlled Substances (Title 21, United States Code, Sections 841(a)(1) and 846) (collectively, the "Target Offenses") and for contraband, fruits of crime, and property used in committing the Target Offenses, as set forth more particularly in Attachment B, including but not limited to quantities of controlled substances, drug paraphernalia, drug packaging materials, cash deriving from the sale of drugs, bank records, business receipts, and invoices and/or documents and records relating to the Target Offenses, including records stored in electronic form.

6.     The facts in this affidavit come from my personal observations, my training and experience, and my conversations with Special Agents and Task Force Officers.  This affidavit is intended to show merely that there is probable cause for the requested criminal complaints, arrest warrants and search warrant and does not set forth all of my knowledge regarding this matter.

7.     The investigation has employed several different investigative techniques, including, but not limited to:

        a.     the gathering of intelligence from reliable cooperating sources;

        b.     the examination of records, including call detail records and motor vehicle records;

        c.     the use of pen registers and trap-and-trace devices;

        d.     the obtaining of precise location information;

        e.     physical surveillance and the use of pole cameras;

f.      controlled purchases of drugs;

g.      court-authorized wiretaps on six cellular telephones; and

h.      the execution of court-authorized search warrants.

## II.    BACKGROUND ON INVESTIGATION

8.      Agents and task force officers of the Federal Bureau of Investigation (FBI) and the Drug Enforcement Administration (DEA) are currently are investigating WILLIS TAYLOR, AQUARIUS GUMBS, SEAN PEPE, GORDON LAURIA, and MARKOS PAPPAS, and other individuals in connection with their manufacturing and distribution of wholesale quantities of counterfeit oxycodone tablets (containing fentanyl) and counterfeit Adderall tablets (containing methamphetamine) in and around New Haven, Connecticut, along with the distribution of other controlled substances, including heroin and cocaine. In addition, the investigation has focused on money laundering of drug proceeds by PAPPAS through one of his purported legitimate businesses, Discount Auto & Cycle in New Haven.

## III.    WIRETAP AUTHORIZATIONS

9.      The wiretap phase of the investigation began in or about June 2022. The Court (the Hon. Kari A. Dooley, U.S. District Judge) authorized the interception of communications over a number of Target Telephones in this case. As relevant to this affidavit, wire and/or electronic communications were intercepted over:

- **Target Telephone 1** (telephone number 203-530-0242, wire and electronic communications), used by WILLIS TAYLOR, from approximately June 15, 2022, through July 15, 2022; August 3, 2022, through August 31, 2022; and October 6, 2022, through November 4, 2022;

- **Target Telephone 2** (telephone number 203-506-5734, wire communications only), used by SEAN PEPE, from approximately June 15, 2022, through July 15, 2022;

- **Target Telephone 4** (telephone number 203-800-5346, wire and electronic communications), used by AQUARIUS GUMBS, from approximately August 3, 2022, through August 31, 2022; and October 6, 2022, through November 4, 2022;

- **Target Telephone 5** (telephone number 203-850-2207, wire and electronic communications), used by GORDON LAURIA, from approximately August 3, 2022, through August 31, 2022.

- **Target Telephone 6** (telephone number 646-889-3523, wire and electronic communications), used by MARKOS PAPPAS, from approximately October 6, 2022, through November 4, 2022; and January 12, 2023, through February 10, 2023.

## IV.    <u>PROBABLE CAUSE</u>

### A.    **Willis Taylor's Drug Trafficking Organization**

10.    The investigation to date has revealed that WILLIS TAYLOR coordinates the manufacturing of counterfeit Oxycodone pills (typically blue pills that, in fact, contain fentanyl) and counterfeit Adderall tablets (typically orange pills that contain methamphetamine) and distributes the drugs to a variety of redistributors, including SEAN PEPE and TAYLOR's son, PETER ABLONDI TAYLOR. PEPE, in turn, supplies other individuals including CHRISTOPHER CAHILL, with quantities of drugs. WILLIS TAYLOR is assisted in his efforts by people like PAUL PAOLELLA and GORDON LAURIA, as described below. Interceptions and surveillance have shown WILLIS TAYLOR arranging deals for other controlled substances like cocaine and counterfeit pills between second and third parties (including MARK APOTRIAS, THOMAS JOSLIN, and DAVID KING), and using AQUARIUS GUMBS as a source in some these transactions. GUMBS has also been intercepted selling quantities of controlled substances to his own customers, including GREATSINGER. Several examples of these transactions are set out below.

*January 6, 2022 – TAYLOR and LAURIA Supply PEPE with Controlled Substances for CAHILL*

11.     On or about January 6, 2022, law enforcement officers were watching PEPE's residence (395 Mansfield Grove, East Haven), via physical surveillance and pole cameras. At approximately 1:28 PM, investigators identified PEPE leaving the residence through the garage door. PEPE entered the driver seat of a BMW and left. Surveillance was maintained on PEPE for a period of time, but investigators decided to stop following PEPE as he appeared to be engaging in counter-surveillance maneuvers by taking random turns and roads.

12.     That same day, from approximately 4:34 PM to 5:30 PM, a telephone associated with CHRISTOPHER CAHILL communicated with PEPE's phone (**Target Telephone 2**) via text message regarding a meeting to take place at PEPE's residence[1]:

CAHILL:     "You home my dude "

PEPE   :     "No but I'm coming out my way in the next 20min"

CAHILL:     "That fly ass white girl around I got bunch of dude want to see big ass lol"

CAHILL:     "You going out towards you crib in a few"

CAHILL:     "Yo just my boy off of Whaley going towards to get highway"

CAHILL:     "Yo I go get my at mom and dads let me no if going to be out your way"

CAHILL:     "Hit me up at my moms picking my some up if not home yet when I leave see if I can get out with out a argument lol"

CAHILL:     "Hit me up when your around bringing my son home"

PEPE:       "I'm home"

13.     Based on my training and experience, I believe that the proceeding text message conversation was used to coordinate a narcotic transaction. When CAHILL referred to "white girl,"

---

[1] These messages were seized after-the-fact pursuant to a search warrant of CAHILL's telephone, as explained below.

I believe that CAHILL was using coded language to ask PEPE if he had any cocaine to sell. CAHILL then sent PEPE several messages indicating his intention to meet with PEPE at PEPE's residence. PEPE then confirmed to CAHILL that he was home and in essence, agreed to the meeting.

14.    Investigators later reviewed electronic surveillance from the pole camera installed outside PEPE's residence and observed that PEPE arrived back at his residence in the BMW at approximately 5:30 PM.  At this point, observations made by investigators were restricted due to the limitations of electronic surveillance during evening hours and the absence of ambient light. Despite the limitations, investigators continued the evening surveillance. At approximately 5:31 PM, **Target Telephone 2** sent a text message to CAHILL's phone which read, "Ok see you in a few drop my little man off I'll come though."

15.    At approximately 6:02 PM, the phone used by GORDON LAURIA called **Target Telephone 2**. At approximately 6:05 PM, investigators observed, via electronic surveillance, a pick-up truck arrive and park in the driveway of PEPE's residence. Investigators saw a subject, later identified as CAHILL, exit the driver's seat and wait to be let into the residence.

16.    At approximately 6:09 PM, the garage door opened and PEPE walked out and entered the driver seat of the BMW. The BMW then backed out of the driveway and departed the residence.  Investigators followed the BMW from PEPE's residence as it traveled into New Haven.

17.    At approximately 6:17 PM, **Target Telephone 2** called GORDON LAURIA's phone twice. At approximately 6:19 PM, investigators observed, via physical and electronic surveillance, PEPE's BMW arrive at 26 Kendall Street and park in the rear parking lot next to a black enclosed trailer and a Jeep frequently operated by LAURIA and WILLIS TAYLOR. The Kendall Street location was identified as a location associated with WILLIS TAYLOR's pill

pressing activities, as described below. At approximately 6:20 PM, PEPE walked from the area of the BMW into the garage.

18.     At approximately 6:38 PM, investigators observed two people emerge from inside the garage and walk to the passenger side of the Jeep. One subject was a white male wearing all back and the other appeared to be PEPE.  PEPE and the other individual remained at the passenger side of the Jeep for a brief time.  At approximately 6:38 PM, PEPE walked to the BMW, opened the passenger door, then reached inside and then closed the door without entering the vehicle. PEPE and the other male then walked back into the garage.

19.     Investigators observed, via electronic surveillance, that at approximately 6:43 PM, PEPE came out of the garage, entered the driver seat of the BMW, and departed the area.  Physical surveillance was maintained on PEPE as he drove directly back to his residence. At approximately 6:45 PM, **Target Telephone 2** called CAHILL's phone.  At approximately 6:54 PM, PEPE arrived back at his residence and met with CAHILL, who was still inside PEPE's residence.

20.     A later review of the recorded electronic surveillance revealed that at approximately 6:48 PM, two men came out of the garage at 26 Kendall Street, slid the door shut, and locked it. One of the males, who was wearing all black, was identified as LAURIA and was carrying a shopping bag with handles. The other male was identified as WILLIS TAYLOR.  LAURIA entered the front passenger seat of the Jeep while WILLIS TAYLOR entered the driver seat of the Jeep, and they left.

21.     At approximately 6:55 PM, investigators observed a male believed to be PEPE exit the garage of his house and walk to the driver door of the BMW. At this time, the lights of the BMW turned on as if a door was opened.  The male believed to be PEPE then returned inside the garage.

22.     At approximately 6:57 PM, the lights on the Dodge pick-up turned on and the garage door opened. CAHILL then came out of the garage and walked up to the passenger side of the pick-up. At this point, the truck's interior dome light turned on, indicating that the truck's door had opened. CAHILL then made a movement towards the truck, as if placing something inside, and then went back inside PEPE's garage and the garage door closed.

23.     At approximately 7:26 PM, the garage door opened again. Investigators observed as PEPE and CAHILL came out of the garage and walked between the BMW and the Dodge. At approximately 7:27 PM, both cars left PEPE's residence. Toll analysis later revealed that at approximately 7:30 PM, LAURIA's telephone called **Target Telephone 2** and at approximately 7:38 PM **Target Telephone 2** called LAURIA.  Based on my training and experience, and the information that investigators later learned as described in the following paragraphs, I believe PEPE and CAHILL engaged in a narcotics transaction at PEPE's residence. I also believe that PEPE obtained at least some of the narcotics from LAURIA and WILLIS TAYLOR when he visited them at the Kendall Street location while CAHILL was waiting back at PEPE's house.

24.     Investigators requested that Connecticut State Police be staged in the area to assist with a motor vehicle stop on CAHILL's Dodge.  Troopers conducted an electronic query search through the CT DMV database and learned that the registration on the Dodge had was expired. Troopers saw the Dodge exit the highway via Exit 8 traveling on Foxon Boulevard toward East Haven and initiated the stop. The Trooper asked CAHILL where he was coming from, and he said, "Waterbury."  In response to questions from the Trooper, CAHILL stated that he had been arrested "a while back" for possession of pills.

25.     Troopers observed that CAHILL was moving around in the vehicle, reaching around, and unable to sit still. Troopers removed CAHILL from the vehicle, and he seemed to be

nervous. Troopers asked CAHILL if there were any weapons inside of the vehicle and he stated, "no, you can check," and he began opening the rear driver side door. Troopers searched the vehicle and found a clear plastic bag containing two small blue round pills with a "V" imprinted on one side (suspected counterfeit oxycodone) in the center console. State of Connecticut laboratory results later confirmed that the tablets contained fentanyl, cocaine, and tramadol.

26. Investigators searched CAHILL's person after they found the suspected narcotics in the vehicle. CAHILL reached in his left pants pocket and pulled out a clear plastic bag containing a white powdery substance, weighing approximately 3.5 grams with packaging. Lab testing later showed that the substance was 2.052 grams of a mixture of cocaine and lidocaine.

27. Investigators asked CAHILL if he had any other contraband on his person, and he pulled out another clear plastic bag containing a larger amount of white powdery substance from the same left pants pocket. The clear plastic bag contained three clear plastic bags, each containing a white powdery substance. A field test was positive for the presumptive presence of cocaine. The cocaine weight was approximately 30.3 grams with packaging. Investigators also found a cellphone in the center console and seized it as evidence. CAHILL was arrested on state charges.

28. On January 18, 2022, the Court, the Hon. Robert Spector, U.S.M.J., authorized a search warrant for CAHILL's cellphone. Investigators conducted a systematic review of the phone and text message conversations between the phone and **Target Telephone 2** that exhibited language consistent with language used to coordinate meetings to complete drug transactions. In addition to conversations on with **Target Telephone 2**, investigators observed text messages between CAHILL and other unidentified people that were consistent with drug transactions.[2] As

---

[2] Investigators reviewed telephone text messages between CAHILL and others, which appear to be conducted in furtherance of CAHILL's drug distribution activities. For example, on January 2,

a result of these text messages and the quantities of drugs involved, investigators believe CAHILL
is a redistributor, rather than simply a customer, of the TAYLOR DTO.

**Summer of 2022 – WILLIS TAYLOR Coordinates the Distribution of Substances to His Son,
PETER ABLONDI TAYLOR**

29.     Intercepts showed that WILLIS TAYLOR distributed controlled substances to his
son, PETER ABLONDI TAYLOR. For example, on June 16, 2022 (session 55), ABLONDI
TAYLOR texted his father: "Went through the 50 already so we're doing good I'll see you tmr I
got a stag to go to at 6 so definitely call me tmr . . . ." I believe that the reference to going through
50 means that ABLONDI TAYLOR distributed 50 units of a controlled substance (believed to be
50 grams of cocaine, as described below) that he had gotten from his father. Later, in a telephone
call on July 5, 2022 (session 1169), WILLIS TAYLOR asked his son: "How'd you do with your
50? . . . Is it working out for you?" and ABLONDI TAYLOR replied, "Yeah. Fucking got like . . .
Yeah, I got like, I don't know. It's probably gone. But I got money." WILLIS TAYLOR then
asked, "Well you let me know when you need?" and ABLONDI TAYLOR replied, "Yeah." Later
on July 7, 2022 (session 1504), ABLONDI TAYLOR called his father. WILLIS TAYLOR asked,
"How much do you need?" and ABLONDI TAYLOR replied, "Just do . . . I guess just 28." I
believe, based upon my training and experience that this is again a reference to cocaine and to
ABLONDI TAYLOR wanted an ounce from his father.

30.     On August 12, 2022 (session 2087), ABLONDI TAYLOR sent a text message to
WILLIS TAYLOR (session 2087) that stated: "Gotta grab something for joe just 14 but wanna be
able to make a lil something from it to him so don't want him just going to you never tell them our

---

2002, an associate of CAHILL stated, "Need." CAHILL responded: "I am waiting someone came
last night and wipe me out should be good in a hour I will hit you up." Investigators believe
CAHILL communicated with the associate explaining that he (CAHILL) was waiting on additional
drugs, and would contact the third party at a later time.

costs." I believe, based on my training and experience, that ABLONDI TAYLOR was telling his father that he wanted to get 14 grams of cocaine from him to sell to a third party, "Joe," and that ABLONDI TAYLOR didn't want the customer going directly to WILLIS TAYLOR because he wanted to make money in the deal.

31.   The next day, on August 13, 2022, WILLIS TAYLOR texted his son (session 2157): "If you can move anything 100 plus I can give to you @26 or 26.5. one piece stuff. Talk soon." I believe that WILLIS TAYLOR was telling his son, ABLONDI TAYLOR, that he had more than 100 grams of pressed cocaine ("one piece") that he could give to him for $26 to $26.50 per gram to sell. Later that day, WILLIS TAYLOR called his son (session 2169) and told him "Exactly what you got last night, but only one piece . . . 500." ABLONDI TAYLOR asked, "Yeah, yeah, yeah, 500?" and WILLIS TAYLOR affirmed: "Yeah, it's half a bird." I believe, based upon my training and experience, that WILLIS TAYLOR was confirming for his son that he had half a kilogram of cocaine ("half a bird," and 500 grams) available to distribute to others.

### June 28, 2022 – WILLIS TAYLOR Obtains Cocaine from GUMBS to Distribute to APOTRIAS

32.   Intercepts and surveillance revealed that WILLIS TAYLOR conducted a hand-to-hand transaction with MARK APOTRIAS on or about June 28, 2022, and involved GUMBS in the transaction. APOTRIAS has been identified as a customer of WILLIS TAYLOR's and has been observed conducting hand-to-hand transactions with his own customers. On or about June 28, 2022, at approximately 10:47 AM, APOTRIAS called spoke to WILLIS TAYLOR on **Target Telephone 1** (session #570):

> TAYLOR:      What's up Mark?
> APOTRIAS:   What's going on?
> TAYLOR:      Not too much.

APOTRIAS:   Hey, that um... 'member... 'member, when we played basketball... I think it was different... when I went [U/I] um... the other player there.

TAYLOR:   Yeah... yeah, [Stammers] that way they... that was ... that was the only player available.

APOTRIAS:   All right.

TAYLOR:   Um, except that... actually... I, I did, uh... make a call to the other player and I think have about... uh... the thing [PH] you need, half of this time.

APOTRIAS:   A'ight, um... no, cause I need it... I needed at least 28 players.

TAYLOR:   Let me see what I got.

APOTRIAS:   Yeah, but it was the old... the old one. The kid with the shiny sneakers. 'Member, it was shiny.

TAYLOR:   Yeah, yeah. Yup.

APOTRIAS:   A'ight. Um... I'm in Milford now at the shop on Orange.

TAYLOR:   Okay.

APOTRIAS:   When do you want me to call you?

TAYLOR:   Give me an hour.

33.     Based on my training and experience, I believe WILLIS TAYLOR and APOTRIAS were using coded language in this conversation. APOTRIAS initiated the topic of basketball and stated he needed "28 players," which is not consistent with the number of players involved in basketball. However, there are roughly 28 grams in an ounce of drugs. I know that an ounce is a common quantity of cocaine to be bought and sold for redistribution purposes. APOTRIAS then spoke about the players' sneakers and indicated how their sneakers were "shiny." Based on my training and experience, I know that high-quality cocaine is pearly white in color and has an iridescent shine to it.

34.     At approximately 10:49 AM, WILLIS TAYLOR, utilizing **Target Telephone 1**, called and spoke to GUMBS on **Target Telephone 4** (session #571):

TAYLOR:   Good morning. How are you?

| GUMBS: | I'm alright. How are you? |
|---|---|
| TAYLOR: | Not too bad. Can I um... catch up to you. |
| GUMBS: | Yeah. |
| TAYLOR: | Um, you want me to go to New Haven? |
| GUMBS: | I'm here. |
| TAYLOR: | A'ight. See you in a little bit. Bye. |

35.     Based on my training and experience, I believe WILLIS TAYLOR and GUMBS were using coded language to arrange a meeting. TAYLOR asked GUMBS to "catch up." Based on surveillance, toll records, and telephone interceptions, I believe that at the time, GUMBS and WILLIS TAYLOR spoke or communicated nearly every day and would not have needed to "catch up." Further, given the subject matter of the previous phone call with APOTRIAS, I believe WILLIS TAYLOR was attempting to procure narcotics from GUMBS in advance of a transaction with APOTRIAS.

36.     Physical surveillance was then established in the area of WILLIS TAYLOR's residence, as well as GUMBS's residence. At approximately 12:34 PM, investigators observed WILLIS TAYLOR exit his house and depart the area driving his black Buick sedan. Physical surveillance was maintained on him as he arrived at GUMBS's house on Batter Terrace in New Haven. At approximately 12:46 PM, WILLIS TAYLOR, utilizing **Target Telephone 1**, texted GUMBS on **Target Telephone 4** (session #574): "I'm at the house on did I go to wrong place."

37.     At approximately 12:56 PM, WILLIS TAYLOR, utilizing **Target Telephone 1**, called and spoke to GUMBS on **Target Telephone 4** (session #575):

| GUMBS: | Hello. |
|---|---|
| TAYLOR: | Hey, did I go to the wrong place? |
| GUMBS: | Where are you? |
| TAYLOR: | Batter. |

| | |
|---|---|
| GUMBS: | No, why you say that? |
| TAYLOR: | I don't know, because I didn't see the car here. |
| GUMBS: | Yeah. |
| TAYLOR: | I didn't see the BMW, I see the Honda. But is that car she drives, isn't it? |
| GUMBS: | Yeah. |
| TAYLOR: | Yeah, your car is not here. |
| GUMBS: | Somebody stole it. |
| TAYLOR: | No, seriously? |
| GUMBS: | Yep. |
| TAYLOR: | No, come on. No, you wouldn't be that calm. Unless you know who stole it. |
| GUMBS: | Nah. Ah gimme five (5) minutes and I got you. |
| TAYLOR: | Okay. |

During the conversation with WILLIS TAYLOR, GUMBS confirmed that he was inside his house and that he needed some time before he would allow TAYLOR inside. Physical surveillance then observed WILLIS TAYLOR standing in front of a side door next to the driveway. TAYLOR was observed as he entered the door and appeared to be walking down a set of stairs into the basement of GUMBS's house. At approximately 1:57 PM, while TAYLOR was inside the basement of GUMBS's house, TAYLOR, texted APOTRIAS (session #578), "Mark, did you get tied up? You said an hour I ran and did what you asked?"

38.     At approximately 4:34 PM, APOTRIAS called WILLIS TAYLOR on **Target Telephone 1** (session #593):

| | |
|---|---|
| TAYLOR: | What happened, bud? |
| APOTRIAS: | Uh, I got stuck on a fucking gas leak. It hit me. |
| TAYLOR: | Yeah? Did you uh... Do you still want ah all those 28 guys? |
| APOTRIAS: | Yeah. |

TAYLOR:    Okay.

APOTRIAS:  As long it's the old school.

TAYLOR:    Yeah, I, I doing the best I can for you, bud.

APOTRIAS:  I know.

TAYLOR:    Uh, you, you didn't get it from me last time; did you?

APOTRIAS:  No, but what, what which uh...

TAYLOR:    Yeah, I... this is the, the... you'll be alright.

APOTRIAS:  The original one?  I'll just look at it and I'll know.

TAYLOR:    Oh, okay.  Okay.

APOTRIAS:  Alright.

TAYLOR:    Alright, bye.

39.    Based on my training and experience, I believe WILLIS TAYLOR and APOTRIAS were again engaging in coded language.  WILLIS TAYLOR asked APOTRIAS if he still needed the "28 guys." I believe WILLIS TAYLOR was referring to the 28 grams of cocaine previously discussed. Later in the conversation, TAYLOR and APOTRIAS each changed their coded language from the plural "28 guys" to using the singular pronoun "it" when they stated, "As long as *it's* the old school," and "…you didn't get *it* from me last time...," and "…I'll look at *it* and I'll know" (emphasis added).  The inconsistency of the coded language further supports my belief that WILLIS TAYLOR and APOTRIAS were discussing a transaction for controlled substances.  I also believe that when WILLIS TAYLOR stated, "Uh, you, you didn't get it from me last time; did you?" he was reminding APOTRIAS that WILLIS TAYLOR did not serve APOTRIAS during his most recent transaction.

40.    At approximately 4:45 PM, APOTRIAS called and spoke to WILLIS TAYLOR on **Target Telephone 1** (session #597):

| APOTRIAS: | Hey!  We, we didn't say... [Stammers]  Did you wanna do it today?  Tomorrow? |
|---|---|
| TAYLOR: | Yeah, no.  I just said.  I just texted you back, [U/I] we'll do it today. |
| APOTRIAS: | Alright.  Uhm... |
| TAYLOR: | Where you want me to go? |
| APOTRIAS: | You wanna go to Depot? |
| TAYLOR: | Okay.  We could do that... Just, uh... gotta give me.... 45 minutes. |
| TAYLOR: | You know what?  I can [Stammers] I can probably be there in... in 25 minutes. |
| APOTRIAS: | Alright.  I can't... A'ight... Make sure... |
| TAYLOR: | Okay. |
| APOTRIAS: | Twenty fiv- [Voices Overlap] |
| TAYLOR: | 25 minutes.  You got it. |

41.     Based on my training and experience, I believe WILLIS TAYLOR and APOTRIAS settled on a meeting place and time of the Home Depot in East Haven at approximately 5:30 PM. Physical surveillance was established in the area of the Home Depot located at 75 Frontage Road, East Haven.

42.     At approximately 5:00 PM, physical surveillance observed WILLIS TAYLOR depart GUMBS's residence.  Surveillance was maintained on TAYLOR as he drove to the Home Depot.  At approximately 5:16 PM, surveillance observed TAYLOR arrive at the Home Depot and park next to a white truck.  The driver of the truck exited the truck and entered the front passenger seat of TAYLOR's Buick. Minutes later, the operator exited the Buick and got back into his truck. The Buick then departed the area.  The white truck then departed the area. Surveillance was maintained on the white truck as it departed the area.

43.     At approximately 5:34 PM, surveillance observed the truck arrive at Krauszer's located at 640 Foxon Hill Road. Surveillance then observed several people walk up to the truck.

(Investigators on surveillance observed that the people appeared to have been waiting for APOTRIAS's arrival.) Investigators observed that APOTRIAS was inside the cargo area of the enclosed white truck with the rear doors opened. Investigators then observed several hand-to-hand transactions occur between APOTRIAS and the awaiting people. Investigators contacted the East Haven Police Department to coordinate a traffic stop of APOTRIAS. A marked East Haven patrol vehicle soon arrived and staged in the area.

44.     At approximately 5:49 PM, surveillance observed the white truck depart the area and drive across the street to a Rite Aid. At approximately 5:53 PM, APOTRIAS left the Rite Aid parking lot. At approximately 5:55 PM, an East Haven patrol vehicle conducted a traffic stop. At this time, the driver was identified as APOTRIAS. The officer conducting the traffic stop was a K9 handler, whose K9 is trained and certified to detect narcotics. The K9 was walked around the exterior of the vehicle and but did not alert for the presence of narcotics. APOTRIAS refused to consent to a search of his truck and subsequently was released from the scene.

45.     Investigators believe that, despite the K9's failure to detect narcotics, APOTRIAS did obtain narcotics from WILLIS TAYLOR during their meeting. The K9's failure to alert for the presence of narcotics is believed to be a result of APOTRIAS's having already sold the narcotics he received from WILLIS TAYLOR to the awaiting customers or to him concealing them within the truck in a manner to avoid K9 detection. That belief was reinforced by later interceptions. On or about July 6, 2022, from approximately 1:45 PM through 2:09 PM, APOTRIAS called and spoke to WILLIS TAYLOR on **Target Telephone 1** (sessions #1297, #1298) to discuss APOTRIAS's motor vehicle stop on June 28, 2022, and other matters. The following is an excerpt of the conversation (session 1297):

TAYLOR:     Hey MARK, what's up?

APOTRIAS:    What's up brother?  Hey is this [Voices Overlap]

TAYLOR:      Hey [Voices Overlap]

APOTRIAS:    Is this a burner that you're on or no?

TAYLOR:      No, this is my phone.

APOTRIAS:    Ah fuck!

TAYLOR:      Uh... It's alright.

APOTRIAS:    Nah, it ain't alright.  Um... I was just talking to T-Bone.  You, you coming back?  You still up at the casino?

TAYLOR:      Yeah, I'm at the casino.

APOTRIAS:    Alright.  [Pause] I don't know, you think is alright?

TAYLOR:      What's that?

APOTRIAS:    You think is alright to talk?

TAYLOR:      Yeah, yeah.  Uh, what I wanna to tell you is um...

APOTRIAS:    Yeah know, let me tell you first

TAYLOR:      Okay. [Voices Overlap]

46.     Based on my training and experience, I know that a "burner" is a telephone to which there is no link to the user of the telephone.  I also know that use of a "burner" phone is sought after by individuals who do not want their communications with others attributed to them. APOTRIAS expressed his uneasiness in speaking to WILLIS TAYLOR on an unprotected phone, which is an indicator that the subject matter to be discussed in the conversation might implicate APOTRIAS and WILLIS TAYLOR criminally.  The conversation continued:

APOTRIAS:    So... so, I went um, to Home Depot to grab wood, you know.

TAYLOR:      Right.

APOTRIAS:    When I left there, I had to take a piss so bad I went to uh... Krauszer's.

TAYLOR:      Mm-hm.

APOTRIAS:    And I was in the back on my truck, and [short pause] alright, Tommy starts walking over to my truck.  I looked across the street and there is a fucking Narc [short pause] in a Malibu tinted window.

TAYLOR:    Wow.

APOTRIAS:    So he.... listen, Tom's is definitively being watched.  [U/I] Krauszer's is being watch.  So ...

TAYLOR:    Yeah [Voices Overlap]

APOTRIAS:    I went by... listen, I went by the Narc.  I stopped, pulled on the side of his car like a fucking idiot. I leave there right...

TAYLOR:    Yeah [Voices Overlap]

APOTRIAS:    Seven [7] [ph] fucking East Haven cops pulled me over.

TAYLOR:    Pulled you over?

APOTRIAS:    Yeah, in my work truck.  Got me in [Voices Overlaps]

TAYLOR:    No!

APOTRIAS:    Listen, this guy is going miserable [ph] "We got a complaint of someone do... someone seen you doing drugs deal."  But there was no hand to hand. There was nothing like that.  So, he goes [Voices Overlap]

TAYLOR:    Huh!  Was it with you and Tommy to reference to?  Or me and you?

APOTRIAS:    No... no, definitively not me and you.

TAYLOR:    Okay.  [Voices Overlap]

APOTRIAS:    Uh no.  Not because they would it... they would it got me leaving [PH]

TAYLOR:    Right.

APOTRIAS:    One hundred percent.  So he goes, "Listen, just hand them over."  I said, "Buddy, I don't know what you talking about.  I don't... there's no fucking drugs.  I don't know what you are talking about.  I was taking a piss in the back of my truck."  Now I, all along I know the Narc's watching.

TAYLOR:    Right.

APOTRIAS:    So he goes, "Listen..." [Voices Overlap]

TAYLOR:    You should have made it obvious for 'em.

APOTRIAS: Yeah, so .. the uh... he goes, "I got the K-9." "So do what you gotta do." K-9, went around the whole truck. He goes, "I need access to the back of your truck." I said, "I know my fourth amendment." I said, "You don't have no probable cause to go in the back of my truck. So you know what the means?" He said, "What's that mean? I said, "You have to give me my license and registration back and I have to go home." He goes, "You're absolutely right." He gave it to me and I left.

TAYLOR:     Was you dirty?

APOTRIAS: Absolutely.

47.     I know that the motor vehicle stop that APOTRIAS is referencing to WILLIS TAYLOR was a coordinated traffic stop between the investigative team and the East Haven Police Department that is explained above. During the traffic stop, as APOTRIAS mentioned in conversation with TAYLOR, officers were unable to locate the purchased narcotics, despite the assistance of a K9 that was trained and certified to detect odors of narcotics. Despite investigators' failure to locate the purchased narcotics that day, APOTRIAS told WILLIS TAYLOR that the narcotics were in fact on his person or within the vehicle at the time of the traffic stop ("Were you dirty?" "Absolutely.").

### July 5, 2022 – WILLIS TAYLOR Distributes Methamphetamine Pills to PEPE

48.     In addition to serving APOTRIAS with cocaine (which he sourced from GUMBS), WILLIS TAYLOR also coordinates regularly with SEAN PEPE to distribute controlled substances. For example, on or about July 5, 2022, at approximately 5:01 PM (session 1140), PEPE, utilizing **Target Telephone 2**, texted WILLIS TAYLOR on **Target Telephone 1**, "U around I'll come to u." At approximately 8:32 PM, surveillance established at PEPE's residence observed PEPE depart in his black BMW. Surveillance was maintained on PEPE. At approximately 8:58 PM, after PEPE's initial text was unanswered, PEPE sent a follow up text (session 1157), "what's going on ru around." At approximately 8:59 PM, WILLIS TAYLOR responded to PEPE (session 1158), "I'm home my phone died."

49.     At approximately 9:15 PM, physical surveillance followed PEPE as he drove to WILLIS TAYLOR's house. Investigators observed the live feed from previously established electronic surveillance (pole camera) as PEPE entered the rear door to the house. Shortly after, at approximately 9:25 PM, physical and electronic surveillance observed MARKOS PAPPAS, arrive at the house and enter through the rear door. At approximately 9:35 PM, physical and electronic surveillance observed PAPPAS leaving WILLIS TAYLOR's house and depart the area in his vehicle. As set forth below, PAPPAS has had TAYLOR process controlled substances for him.

50.     At approximately 10:51 PM, physical and electronic surveillance observed PEPE as he exited the rear door of WILLIS TAYLOR's house and entered his black BMW. Physical surveillance was maintained on PEPE as he departed the area. PEPE was followed through backroads in West Haven before eventually getting onto I-95 North.

51.     A motor vehicle stop was coordinated with the Connecticut State Police. At approximately 11:05 PM, as PEPE got off exit 51 in East Haven, State Police Troopers, with the assistance of an FBI Task Force Officer, initiated a motor vehicle stop for traffic violations. PEPE was positively identified during the course of the motor vehicle stop. Subsequently, PEPE was confirmed to have an active arrest warrant for Violation of Probation. PEPE exited the vehicle and was taken into custody and placed in the rear of a State Police cruiser. The driver door of the BMW was left ajar. In plain view, the FBI TFO observed a clear plastic straw on the upper door handle. Based on training and experience, the TFO knew that plastic straws are commonly used by pill-seeking individuals to ingest narcotics into their nasal cavity. In addition, in plain view in the area under the driver seat, the TFO observed a small clear plastic bag containing dozens of orange-colored circular tablets. The bag was immediately recognized as narcotics and seized. Further examination of the seized bag showed the tablets were stamped "30/b974." PEPE was transported

to Troop G barracks and later released on bond. PEPE was not charged with the narcotics at that time. Lab testing later revealed that the seized narcotics included 85 whole or partial tablets containing a total of approximately 31.586 grams of a mixture containing methamphetamine, which I believe that PEPE obtained from WILLIS TAYLOR during the meeting with PEPE and TAYLOR at TAYLOR's residence (which PAPPAS was also present for).

### August 5, 2022 and August 12, 2022 – WILLIS TAYLOR/ PEPE Provide Drugs to DAVID KING/ THOMAS JOSLIN

52.     The investigation also revealed that WILLIS TAYLOR and SEAN PEPE coordinated together to provide counterfeit pills to third parties, including DAVID KING and THOMAS JOSLIN. For example, on August 5, 2022, at approximately 12:07 PM, JOSLIN called and spoke to WILLIS TAYLOR on **Target Telephone 1** (session 1690). During the investigation, JOSLIN was identified as a narcotics customer of WILLIS TAYLOR.[3]  JOSLIN and TAYLOR spoke to coordinate a deal for controlled substances between TAYLOR and a third-party customer, referred to as "Dave," later identified as DAVID KING.

| | |
|---|---|
| TAYLOR: | Hey, boss. |
| JOSLIN: | Hey, buddy.  How you doing? |
| TAYLOR: | Alright.  Feeling a little better. |
| JOSLIN: | Yeah.  [Clear Throat]  My buddy called you? |
| TAYLOR: | Ye-Yeah. |
| JOSLIN: | Alright.  [Voices Overlaps] |
| TAYLOR: | He called, he called me about something um, other than what me and you do. |
| JOSLIN: | No, not him.  [Pause]  Dave. |

---

[3] For example, on August 19, 2022, WILLIS TAYLOR sent a text message to JOSLIN stating: "Tommy yours are still warm finishing now 35 min," which I believe is a reference to WILLIS TAYLOR manufacturing counterfeit pills to distribute to JOSLIN.

| TAYLOR: | Oh, no! |
|---|---|
| JOSLIN: | He told me he fucking called you. |
| TAYLOR: | Hold on, maybe he did and I didn't hear the phone. |
| JOSLIN: | Well, call him back. |
| TAYLOR: | And, uh, tell Mark that, ah! He can call me I just, I did do, I... did something for him. |
| JOSLIN: | Yeah, if I talk to him. |
| TAYLOR: | Alright. |
| JOSLIN: | Call, call him right now 'cause you, you need to go see him. Or he's gonna need to come and see you. |

53.     Based on my training and experience, I know that the practice of "middling" a deal involves one party calling a drug trafficker on the behalf of a third party to arrange a meeting between the trafficker and the third party customer. In many cases, the first party benefits by accepting a percentage of the proceeds resulting from the sale. I believe JOSLIN called WILLIS TAYLOR to "middle" a deal for a quantity of a controlled substance between TAYLOR and a third party ("my buddy"). Following the conversation with JOSLIN, at approximately 1:03 PM, WILLIS TAYLOR received a phone call over **Target Telephone 1** from DAVID KING (session 1699).

| TAYLOR: | Alright. [Pause] |
|---|---|
| KING: | I'm ready when you are. |
| TAYLOR: | Um. I'm not... [stammers] I'm not ready yet. I got, uh... put some things together. I didn't... he didn't wanna, uh... |
| KING: | Alright. |
| TAYLOR: | He didn't send on the line. I only got like 100 here. |
| KING: | Alright. Oh. Alright. |
| TAYLOR: | Alright? |

54.     Based on my training and experience, I believe that WILLIS TAYLOR and KING were coordinating a deal for counterfeit pills ("some things"). However, WILLIS TAYLOR expressed to KING that he did not currently have enough supply on hand to fulfill KING's order ("Um. I'm not... [stammers] I'm not ready yet.  I got, uh... put some things together..."). WILLIS TAYLOR's statement to KING that "I only got like 100 here" indicates to me that WILLIS TAYLOR knew KING was seeking a quantity great than 100 pills despite the fact that no previous mention of quantity was discussed in the conversation.  Based on my training and experience, I believe that this familiarity is indicative of previous transactions between TAYLOR and KING. The same conversation continued:

KING:       So... Yeah. So, around what time are you talking?

TAYLOR:     Uhm... I don't know.  I gotta try to find the shit.

KING:       Will ya... [Voices Overlap]

TAYLOR:     Because I've been sick with Covid.  So, it's like...

KING:       Oh, yeah.  I forgot.  [Aside: What's up bro?]

TAYLOR:     So, I haven't been, I don't know, I gotta go find stuff.  And stuff like that. I've been fucking sick with the Covid, I haven't fucking moved.  [Pause] So, you gonna have to give me, uh, a little bit of time to figure out what the fuck... where everything is. Cause [Pause]

(...)

TAYLOR:     So, um... So, now I gotta find... Put everything together.  I can't find anything. [Pause]

KING:       Uhm. Well... so, you don't know then.

KING:       Alright.  That's good.

TAYLOR:     The, uh... Nah.  No.  I know I got 100 here.  But I don't, uhm... [Pause]

KING:       Well, you wanna do it tomorrow morning then?

TAYLOR:     Yeah.  Tomorrow morning will be better.

KING:     Alright.  Well, I'd like to get it done early.

TAYLOR:   Alright.

KING:     He'll call you in the morning.  What time?

TAYLOR:   Alright.  He can call me seven (7:00), eight (8:00) in the morning.  Is fine.

KING:     Alright.  We'll call you when you... what time do you get up?  [Aside: Yeah, yeah.  He said you can call him as early]

55.     Based on my training and experience, I believe WILLIS TAYLOR and KING agreed to a meeting for the purchase of more than "100" pills to take place the following morning. This meeting was tentative, based on WILLIS TAYLOR's ability to procure enough controlled substances ("put everything together").

56.     Following the conversation with KING, at approximately 1:51 PM, WILLIS TAYLOR, utilizing **Target Telephone 1**, texted SEAN PEPE on **Target Telephone 2** (session 1707): "Sean I ended up sick as a dog in GA. I have COVID for second time after being vaccinated and with boosters. I need to see you I'm sick and my other part isn't responding to me I need a few back until tomorrow please." Based on my training and experience and knowledge of this case, I know WILLIS TAYLOR has several partners, including GUMBS (his "other part").  I believe WILLIS TAYLOR attempted to communicate with GUMBS or another supplier and was unsuccessful.  I believe that when WILLIS TAYLOR stated "I need a few back until tomorrow please," WILLIS TAYLOR was asking PEPE to give him some counterfeit pills on loan so that WILLIS TAYLOR could distribute it to KING, as referenced above. WILLIS TAYLOR also sent an outgoing message to PEPE on **Target Telephone 2** (session 1708), "I also got something dropped off to my you might like very white." Based on my training and experience, I believe WILLIS TAYLOR also offered PEPE cocaine ("white").

57.     WILLIS TAYLOR and PEPE exchanged several text messages to coordinate their meeting over **Target Telephone 1** and **Target Telephone 2** (sessions 1709, 1710, 1711, 1712, 1713):

PEPE:       Ok your home u need me to bring it to u I don't want to get COVID,

PEPE:       How many did u need me to bring to u

PEPE:       ??

TAYLOR:     400 I can get someone off my back I will have you covered I promise.  I don't have cash so that helps me until I get things done tonight

TAYLOR:     If you are tight 300

58.     Based on my training and experience, I believe WILLIS TAYLOR asked PEPE for a quantity of 300 or 400 of a counterfeit pills.  Based on the context of this call, I believe that PEPE is indicating to WILLIS TAYLOR that he has supplies of pills available at his residence that PEPE can provide to WILLIS TAYLOR if needed.

59.     At approximately 2:00 PM, PEPE, utilizing **Target Telephone 2**, called and spoke to WILLIS TAYLOR on **Target Telephone 1** (session 1714).  The following is a portion of the call:

PEPE:       Alright, uh, I don't think I have that many left, but whatever I have, want me to just bring it to you?

TAYLOR:     Yeah, if I, 300 would be perfect for me.

PEPE:       Okay.

TAYLOR:     Alright?

PEPE:       Whatever I got I'll bring to you and then I'll get back from you tomorrow?

TAYLOR:     Yeah you will get, you will have it back tomorrow guaranteed.

PEPE:       No problem.

TAYLOR:     Alright.

| PEPE: | You're home right? |
|---|---|
| TAYLOR: | Yeah I'm home. |
| PEPE: | Okay, I'm going to swing by. |
| TAYLOR: | Thank you Sean. |
| PEPE: | No problem, I'll see you later [Voice Overlap] |
| TAYLOR: | Hey by the way, I got, I got white dropped off to me last night too. |
| PEPE: | Something good? |
| TAYLOR: | Yeah, it seems [Voice Overlap] |
| PEPE: | I'll see you [Voice Overlap] |
| TAYLOR: | Alright I'll see you when you get here. |
| PEPE: | I'll see you in like half hour. |

60.     Based on my training and experience, I believe PEPE agreed to meet at WILLIS TAYLOR's residence ("Okay, I'm going to swing by"), to loan WILLIS TAYLOR the quantity of 300 pills ("Whatever I got I'll bring to you and then I'll get back from you tomorrow?"). Based on my training and experience, I believe WILLIS TAYLOR again offered PEPE cocaine when he stated, "Hey by the way, I got, I got white dropped off to me last night too." In particular, I know that "white" is a common coded street term for powder cocaine.

61.     At approximately 4:30 PM, investigators monitored the pole camera at PEPE's residence. At approximately 4:40 PM, investigators observed PEPE depart his house in a black sedan. Mobile surveillance followed PEPE as he traveled to WILLIS TAYLOR's house, arriving at approximately 5:06 PM. Shortly after, surveillance observed PEPE and WILLIS TAYLOR exit WILLIS TAYLOR's house together.

62.     At approximately 6:04 PM, WILLIS TAYLOR initiated a text conversation with KING over **Target Telephone 1** (sessions 1732, 1733, 1734, 1736, 1738, 1739):

TAYLOR:  Dave something came up I have to do it tonight. Can you come to the same place as last time where the trailer is thanks

KING:  I'm out of town

KING:  So t be back til 10p

TAYLOR:  After 10 will work for me

TAYLOR:  How about you

KING:  Ok

63.     Following the text conversation, at approximately 6:10 PM, KING called and spoke to WILLIS TAYLOR over **Target Telephone 1** (session #1740):

KING:  ... bro. So, I'll leave here about nine (9:00). I'll get home at about 10. And then, I'll give you a ring.

TAYLOR:  Okay. Good enough. Fair enough [Voices Overlap]

KING:  Alright, bud. Thank you [Voices Overlap]

TAYLOR:  Thanks, bud. Bye-bye.

KING:  Yup. Bye-bye.

64.     Based on my training and experience I believe WILLIS TAYLOR and KING discussed and scheduled the previously discussed meeting to take place at approximately 10:00 PM.

65.     At approximately 9:49 PM, KING texted WILLIS TAYLOR on **Target Telephone 1** (session #1771), "Just got home heading your way...you around ?" KING followed up his initial text with (session #1772), "Hello ?" At approximately 10:09 PM, WILLIS TAYLOR, utilizing **Target Telephone 1**, called and spoke to KING (session #1779):

TAYLOR:  [U/I] Dave, what's happening?

KING:  [Inhales] How you doing?

TAYLOR:  Alright. I, I just seen I missed your call. I'm heading to East Haven at this point.

KING:          Yeah, that's good.  Where uh..., where, where you want me to see you? [Voices Overlap]

TAYLOR:        How bout' the, uh..., how bout' at the corner of uh..., I am going to that uh, to that uh... Oh!  Is he closed already?  No, he don't close until 11:00. [Voices Overlap]

KING:          Who? [Voices Overlap]

TAYLOR:        The guy on Dodge Avenue.

KING:          [Background: noise]  Uh, Dodge Ave... [Voice Overlap]

TAYLOR:        Dodge and Hemingway?

KING:          Uh, what?  The Deli?  [Background: Squeak noise]

TAYLOR:        Yeah.

KING:          You want...  Yea, I think they close at 11:00.  You want me to meet you there?

TAYLOR:        Yeah.  That's where I'm headed right now.

KING:          Alright.  I'll see you in about 10 minutes.

66.    Based on my training and experience, I believe that WILLIS TAYLOR and KING discussed the final details regarding the pending meeting for a quantity of controlled substances that were provided to WILLIS TAYLOR by PEPE.

67.    Surveillance was re-established in the area of Dodge and Hemingway Avenues and at WILLIS TAYLOR's house. At approximately 10:20 PM, surveillance observed WILLIS TAYLOR leave his house in his white BMW sedan. Surveillance followed TAYLOR as he traveled to the meet location at Dodge and Hemingway. At approximately 10:30 PM, investigators observed KING at Dodge and Hemingway leaning against his motorcycle. At approximately 10:32 PM, surveillance observed WILLIS TAYLOR arrive at Dodge and Hemingway Avenues and meet with KING. Investigators watched as KING leaned into the front passenger side window of WILLIS TAYLOR's BMW and conducted what appeared to be a hand-to-hand transaction. Based

on my training and experience, I believe WILLIS TAYLOR sold KING controlled substances that were provided by PEPE.

68.     Similarly, on August 12, 2022, JOSLIN called WILLIS TAYLOR over **Target Telephone 1** at about 1:51pm (session 2084). JOSLIN told WILLIS TAYLOR: "Dave's going to call you," to which TAYLOR responded: "Okay. We're all set." JOSLIN reminded TAYLOR: "Make sure they're right . . . Same thing."[4] TAYLOR replied, "Yup. Bye."

69.     On August 12, 2022 at 2:08 PM (session 2085), TAYLOR received a call from KING and the two made plans to meet. KING requested, "Hey, what time can you meet for coffee?" TAYLOR responded, Um…you could come here. We can meet for coffee anytime." KING agreed and responded in kind, "Alright, I got to be quick... [Voices Overlap]"

70.     At approximately 2:40 PM (Session 2086), KING texted "I'm here." At the same time, surveillance officers saw KING arrive in his white Jeep at WILLIS TAYLOR's residence. KING went into the house for about two minutes before leaving and driving away in his Jeep.

### *October 10, 2022 – WILLIS TAYLOR Processes Drugs for PAPPAS*

71.     In addition to supplying his own customers with counterfeit pills, the investigation revealed that WILLIS TAYLOR also pressed controlled substances for MARKOS PAPPAS, with the assistance of others including SEAN PEPE and GORDON LAURIA. MARKOS PAPPAS was identified, through numerous source reports as the current regional leader of the Latin Kings gang. In this position, PAPPAS has had the assistance of other Latin King members in his drug

---

[4] Following the August 5 transaction described above, KING had texted WILLIS TAYLOR over **Target Telephone 1** on August 8, 2022 (session 1882): "The other night was shy 30 . . ." which I believe indicated that WILLIS had not provided to request 300 units, but only 270. I believe JOSLIN's statement to WILLIS on August 12 to "make sure they are right," is a reminder to provide the correct amount of controlled substances to he and KING.

distribution and laundering money through his businesses. A few of these Latin King members are described in further detail below.

72.     On or about October 10, 2022, at approximately 12:09 PM, PAPPAS, utilizing **Target Telephone 6**, called and spoke to WILLIS TAYLOR on **Target Telephone 1** (Session 768):

> TAYLOR:     Hey stranger!
>
> PAPPAS:     Hey, where have you been?
>
> TAYLOR:     I've been uh…[Short Pause] home, unless I was uh, out with the girls at night. One night though, that's all.
>
> PAPPAS:     Where are you know?
>
> TAYLOR:     I'm home!
>
> PAPPAS:     Alright, you…You got time to see me?
>
> TAYLOR:     Absolutely
>
> PAPPAS:     Alright, I'll be right by.

73.     At approximately 12:54 PM, second brief phone call was made from PAPPAS to WILLIS TAYLOR via **Target Telephone 6** (Session 776):

> TAYLOR:     Hey bud.
>
> PAPPAS:     You still home?
>
> TAYLOR:     I'm still home, yes.
>
> PAPPAS:     Alright. I'm gonna shoot right back now.
>
> TAYLOR:     Alright.
>
> PAPPAS:     I'll be right by.

74.     The phone calls between WILLIS TAYLOR and PAPPAS were typical of other phone calls between them where few details were provided other than a place ("You still home?") and time ("I'm gonna shoot right back now") of a meeting. These calls continue a pattern of

PAPPAS and TAYLOR meeting in person rather than speaking about their drug trafficking over the telephone, which I believe the avoidance of speaking on the telephone is an indication of PAPPAS's and TAYLOR's familiarity of law enforcement investigative techniques, specifically, Title III intercepts.

75.     Investigators reviewed pole camera footage of WILLIS TAYLOR's residence from this time period.  At approximately 12:55 PM on October 10, 2022, GORDON LAURIA arrived at TAYLOR's house on his motorcycle.  At approximately 12:58 PM, LAURIA entered the rear door of the residence. At approximately 1:12 PM, LAURIA exited the rear door and departed the residence.

76.     As LAURIA departed the camera view, PAPPAS arrived at TAYLOR's house in his Lincoln MKX SUV. LAURIA then returned to the residence and parked his motorcycle behind PAPPAS's Lincoln. LAURIA walked to the front driver side window of the Lincoln empty-handed. The driver's side window of the Lincoln was out of camera view. However, when LAURIA emerged back in camera view from the area of the driver side of the Lincoln, he was carrying what appeared to be a box or container, possibly red/orange in color. LAURIA walked from the Lincoln and entered the rear door of WILLIS TAYLOR's house. At approximately 1:13 PM, LAURIA exited the rear door of the house empty handed. LAURIA returned to his motorcycle and LAURIA and PAPPAS departed in tandem. PAPPAS never exited his Lincoln or had any interaction with TAYLOR while he was at 67 Edward Street.

77.     Due to the vagueness of the communications coordinating the meeting, the brief duration of the meeting itself, and my observations of a container being delivered from PAPPAS to TAYLOR, I believe PAPPAS met WILLIS TAYLOR at 67 Edward Street to deliver a box

containing an unknown quantity of an unspecified controlled substance to TAYLOR, to process into pills, and used LAURIA to physically deliver the product.

78.     Indeed, minutes later, at approximately 1:18 PM, WILLIS TAYLOR, utilizing **Target Telephone 1**, called and spoke to SEAN PEPE (session 3770):

| | |
|---|---|
| PEPE: | Hello! |
| TAYLOR: | Hey! |
| PEPE: | Yo! |
| TAYLOR: | You coming by? You're going to come by? |
| PEPE: | Yeah! |
| TAYLOR: | Alright good, cause I'm opening something and I wanted you to try something. |
| PEPE: | Uh? I ain't hear what you said. |
| TAYLOR: | I said I'm opening something new, I wanted you to try some. |
| PEPE: | Okay you didn't get my text [Voice Overlap] |
| TAYLOR: | Okay [Voice Overlap] |
| PEPE: | .... I said I'll be there within the hour. |

79.     When TAYLOR told PEPE he was "opening something" and had "something" for PEPE to try, I believe TAYLOR was referring to the package he obtained from PAPPAS (through LAURIA). I believe that PEPE and TAYLOR would both sample the product, and that PEPE would also assist TAYLOR with the processing of the drugs. (Following TAYLOR's state arrest on October 20, 2002, he advised investigators that he "sampled" all his products for safety purposes before they were distributed.)

80.     Three days later, on or about October 13, 2022 at 1:54 PM (session 1463), PAPPAS received a text message over **Target Telephone 6** from an employee at DAC, his business: "Willie is here with parts he machined." I believe that this employee was reporting to PAPPAS that

WILLIS TAYLOR had arrived at DAC, PAPPAS's automotive garage, and that "the parts he machined" was a reference to narcotics that TAYLOR had pill-pressed for PAPPAS. I believe this product was a result of the processing of the substance which PAPPAS dropped off to TAYLOR on October 10 as described above. Indeed, investigators reviewed the electronic surveillance at DAC, which is located at 376 Quinnipiac Avenue. At approximately 1:43 PM, WILLIS TAYLOR's black Buick sedan arrived at 376 Quinnipiac. At 1:46 PM, WILLIS TAYLOR walked into view of the camera carrying a box or container that was red/orange in color. WILLIS TAYLOR carried the container into the garage bay door. I believe the box carried by TAYLOR and delivered to 376 Quinnipiac was the same box delivered to TAYLOR by PAPPAS through LAURIA on October 10, 2022. At approximately 2:16 PM, I observed TAYLOR exit the garage empty-handed, walk to his Buick, and depart the area.

### *October 15, 2022 – GUMBS Distributes Cocaine to GREATSINGER*

81. In addition to supplying WILLIS TAYLOR with quantities of cocaine to redistribute, the investigation revealed that GUMBS had other redistribution customers, including RICHARD GREATSINGER. For example, on or about October 15, 2022, at approximately 7:16 PM, GUMBS received a phone call on **Target Telephone 4** from GREATSINGER (session #2386):

| | |
|---|---|
| GUMBS: | Yo. |
| GREATSINGER: | Yo, what's up, man? |
| GUMBS: | I was sleeping, nigga! What's up, with you? |
| GREATSINGER: | God damn, man! [Laughs] Fuck, man! Can I come by real quick? |
| GUMBS: | It's a mess over here right this second. I had a sewage back up. |
| GREATSINGER: | I mean, you know. I really don't care about that, dog. [Chuckles] You know, nigga already worked all day. So getting a little dirtier ain't- [Voices Overlap] |

| GUMBS: | I need- I need uh, I know but- I'm trying to keep- shock it around. At least I'm out till I cleaning out there. Cleaning it up now. I need another half an hour (½). |
| GREATSINGER: | Alright my nigga I got you. Seven (7), 47 it is, bro. [Chuckles] |
| GUMBS: | Alright. [Chuckles] |
| GREATSINGER: | Alright, have some tasty drinks for me. You heard? [Laughs] |
| GUMBS: | Yeah. One. |

82.     Based on previous surveillances and intercepted communications over **Target Telephone 4**, investigators had identified GREATSINGER as a drug customer of GUMBS. When GREATSINGER stated, "Can I come by real quick," I believe, based on my training and experience, that GUMBS and GREATSINGER were planning a meeting to procure a quantity of a controlled substance. Based on prior intercepts, I also believe that GREATSINGER and GUMBS often use alcohol or alcoholic beverages as code words to disguise narcotics transactions.

83.     At approximately 8:00 PM, surveillance was established in the area of GUMBS's residence. At approximately 11:10 PM, physical surveillance observed a black older model Ford Explorer bearing Connecticut registration AR49553 turn into the driveway of the house. Once the Explorer arrived, physical surveillance observed a white heavy-set male with a beard, later identified as GREATSINGER, who exited the driver seat of the vehicle. GREATSINGER entered GUMBS's house from the side door. The side door is located on the driveway, near the rear corner of the residence. (This side door is the same side door that TAYLOR entered on June 28, 2022.) At the time of the meeting between GUMBS and GREATSINGER, location data on **Target Telephone 4** showed GUMBS was in the area of his residence.

84.     Later that night, at approximately 12:05 AM (now October 16, 2022), physical surveillance observed GREATSINGER exit GUMBS's house, enter the driver seat of the Explorer, and depart the area. Physical surveillance followed the Explorer onto Derby Avenue traveling

toward Ella T. Grasso Blvd. As GREATSINGER continued driving, DEA coordinated with the West Haven Police Department to assist with a motor vehicle stop on the Explorer. A uniformed officer who was operating a marked police vehicle equipped with red and blue emergency lights was currently in the area and able to assist. The officer followed the Explorer in his marked police vehicle and, after observing moving violations, activated his red and blue emergency lights and conducted the motor vehicle stop in the area of First Avenue and Campbell Avenue in West Haven. GREATSINGER was the operator and sole occupant in the vehicle. K9 Officer Butler, who was also in a marked police vehicle, was contacted to utilize his partner, K9 Hanny, who is a trained narcotic detecting Labrador. While on scene, K9 Hanny conducted a free air sniff around the vehicle. K9 Hanny alerted to the presence of narcotics inside of the vehicle. Upon searching the vehicle, located in the center console was one clear knotted plastic bag containing white powdery substance, suspected to be cocaine and/or fentanyl. GREATSINGER was arrested and transported to West Haven Police Department detention center located at 200 Saw Mill Rd., West Haven, CT, where he was processed and held on bond. The suspected narcotics were sent to the State of Connecticut laboratory for analysis. Subsequent testing revealed that the plastic bag contained a net weight of 25.012 grams of cocaine hydrochloride.

### *October 20, 2022 Seizure of Drugs from WILLIS TAYLOR and PAUL PAOLELLA*

85. On or about October 20, 2022, law enforcement established a combination of physical and electronic surveillance in the area of WILLIS TAYLOR's house, and in the area of 65 Saginaw Trail, Shelton, CT, a "stash" location used by TAYLOR to store drugs. (The resident of that house has a personal relationship with WILLIS TAYLOR). At approximately 8:40 AM, surveillance observed WILLIS TAYLOR arrive at the Shelton address a black Buick sedan. Surveillance then observed WILLIS TAYLOR exit the Buick sedan carrying a black duffel bag that appeared to be empty and enter the house.

86.     At approximately 9:56 AM, surveillance observed WILLIS TAYLOR exit the front door of the residence carrying two bags in his hands. The first bag appeared to be the same black leather duffel bag that now appeared weighted and full. The second bag was a white "tote" style bag that also appeared weighted and full. WILLIS TAYLOR carried both bags to the rear of the Buick and loaded them both into the trunk. He then entered the driver seat and surveillance observed him depart.

87.     At approximately 10:06 AM, surveillance was maintained on WILLIS TAYLOR as he drove through back roads toward Route 15 North. Surveillance followed WILLIS TAYLOR on Route 15 and onto Interstate 95. Surveillance was maintained as TAYLOR exited I-95 at exit 43 toward West Haven. For a moment, surveillance terminated visual contact with TAYLOR's vehicle as it went down a short one-way road with only one exit. Investigators obtained visual contact with the vehicle several minutes later, and there was now a front seat passenger. WILLIS TAYLOR was still identified as the operator and the front seat passenger was believed to be PAUL PAOLELLA.[5]

88.     Surveillance then followed the Buick to the area of WILLIS TAYLOR's residence in West Haven, where physical surveillance was terminated to avoid detection. Visual surveillance, however, was then picked up on the pole camera at the residence at approximately 10:30 AM. The Buick parked on the side of the road in front of the driveway of the house and the male later confirmed to be PAOLELLA exited the front passenger seat of the Buick. WILLIS TAYLOR then exited the driver seat and the two individuals walked into the rear door of his house with nothing in their hands.

---

[5] PAOLELLA was identified through wire intercepts on both **Target Telephone 1** and **Target Telephone 2** as a close associate of both TAYLOR and PEPE.

89.     At approximately 10:42 AM, surveillance observed PAOLELLA exit the rear door of TAYLOR's house with a red and black binder in his hands. WILLIS TAYLOR then exited the residence behind PAOLELLA and the two individuals walked to the Buick sedan. It appeared TAYLOR was not carrying anything in his hands. Surveillance observed WILLIS TAYLOR walk to the Buick and open the trunk. Inside the trunk, surveillance was able to observe the black leather duffel bag and the white "tote" style bag, which appeared to be the same as those removed from the Shelton stash location earlier. WILLIS TAYLOR was observed opening both bags. Surveillance observed PAOLELLA walk to the Buick and place the red binder into the rear passenger compartment of the Buick. PAOLELLA and WILLIS TAYLOR were observed manipulating the front and rear passenger door panels of the Buick.

90.     PAOLELLA then entered the driver's seat of the Buick. WILLIS TAYLOR entered the driver seat of a white BMW 7 series bearing an Arkansas dealer plate, which was also parked on the side of Edward Street in front of his house. At approximately 10:44 AM, WILLIS TAYLOR and PAOLELLA departed TAYLOR's residence in tandem and surveillance followed.

91.     At approximately 10:45 AM, surveillance followed WILLIS TAYLOR and PAOLELLA as they drove in tandem through West Haven and onto I-95 North. Surveillance was maintained as WILLIS TAYLOR and PAOLELLA drove directly to 376 Quinnipiac Avenue, New Haven, which is DAC, the garage owned by PAPPAS. Surveillance observed both vehicles park in the front parking lot at this location.

92.     At approximately 10:55 AM, surveillance observed WILLIS TAYLOR exit the driver seat of the BMW and walk into the front door of the garage with nothing in his hands, while PAOLELLA remained in the Buick for a short period of time. PAOLELLA then exited the Buick and lit and smoked a cigarette while he walked around the parking lot. Minutes later, WILLIS

TAYLOR was observed as he exited through a garage bay door and walked toward PAOLELLA again, with nothing in his hands. WILLIS TAYLOR and PAOLELLA walked to the Buick sedan where WILLIS TAYLOR entered the driver seat and PAOLELLA entered the front passenger seat. WILLIS TAYLOR then drove the Buick through the parking lot of the garage and departed the area. The white BMW was left at the auto garage.

93.     Surveillance was maintained on the Buick as it drove on Quinnipiac Avenue toward East Haven/Route 80, onto Route 80, and then onto Foxon Hill Road. The Buick arrived in a driveway of THOMAS JOSLIN's house on Foxon Hill Road at approximately 11:09 AM. Surveillance teams were unable to maintain visual contact on WILLIS TAYLOR while he was at this address due to it being a residential neighborhood. At approximately 11:18 AM, surveillance observed the Buick depart JOSLIN's residence on and travel toward Route 80. At that time, investigators coordinated with the East Haven Police Department to conduct a motor vehicle stop of the Buick.

94.     At approximately 11:20 AM, a marked East Haven Police Department patrol vehicle conducted a stop of the Buick for a traffic violation. WILLIS TAYLOR and PAOLELLA were still the occupants of the Buick, with TAYLOR driving and PAOLELLA in the front passenger seat. Officer Palma responded to the scene of the traffic stop. Officer Palma is a trained K9 handler and he works with his K9 partner "Enzo." Officer Palma's K9 is trained in the detection of narcotics. Officer Palma walked his K9 partner around WILLIS TAYLOR's Buick sedan where it positively alerted to the presence of narcotics.

95.     A search of the Buick resulted in the discovery of a red and black binder containing what I believe, based on my training and experience, is a drug ledger. The red and black binder is the same binder that surveillance observed PAOLELLA remove from TAYLOR's house and place

into the Buick sedan. The ledger included what I believe are references to drug debts owed by various criminal associates of TAYLOR's organization.

96.     A search of the trunk compartment of the Buick resulted in the discovery of a black leather duffel bag and a white "tote" style bag, matching the bags that surveillance observed WILLIS TAYLOR remove from the Derby stash house and place into the Buick sedan. The duffel bag was found to contain quantities of cocaine and the tote bag was also found to contain quantities of narcotics. Also located in the passenger compartment was a black zippered container, containing quantities of orange tablets and blue tablets, of suspected controlled substances. The pills and narcotics found in the trunk of the Buick were field tested and indicated presumptive positive results for methamphetamines, amphetamines, cocaine, and fentanyl, among other narcotics. WILLIS TAYLOR was arrested on state charges relating to his possession of these narcotics. A photograph of some of the items seized from the Buick is below.



97.     The orange pills in the image above resembled the same orange pills seized during the arrest of PEPE on July 5, 2022, discussed above, after PEPE and WILLIS TAYLOR were observed conducting a hand-to-hand transaction at TAYLOR's house.

98.     As of the date of this affidavit, the laboratory results received to date are reflected below, with other laboratory results still pending at this time. The substances were preliminarily identified by the arresting police department as the following (weights include packaging unless confirmatory laboratory tests are noted):

- 30.8 grams of hard, white, rock-like substance suspected to be cocaine and fentanyl;

- 211.3 grams of white, crystal-like substance suspected to be methamphetamine;

- 270.5 grams of a white, rock-like substance suspected to be crack cocaine;

- 155.9 grams of a white, crystal-like substance suspected to be methamphetamine;

- 112.9 grams of oval orange pills suspected to be methamphetamine;

- 34.3 grams of white rectangular pills of an unknown substance;

- 3.2 grams of a white powdery substance suspected to be methamphetamine powder;

- 38 grams of a black tar-like substance suspected to be hashish;

- 470.2 grams of an unidentified black, rock-like substance;

- Laboratory-confirmed 333.5 grams of a mixture and substance containing fentanyl, tramadol and heroin;

- Laboratory-confirmed 104.389 grams of orange pills of a mixture and substance containing methamphetamine;

- 132.2 grams of blue pills suspected to be fentanyl;

- 19.2 grams of a white powdery substance suspected to be methamphetamine;

- 401.9 grams of a hard, white substance suspected to be cocaine and fentanyl;

- 546.2 grams of a hard, white, rock-like substance suspected to be cocaine and fentanyl;

- Laboratory-confirmed 261.0 grams of a mixture and substance containing methamphetamine;

- 447.1 grams of a white, hard, rock-like substance suspected to be cocaine and fentanyl;

- 236.1 grams of a hard, white, rock-like substance suspected to be cocaine and fentanyl;

- 338.9 grams of brown powdery substance suspected to be heroin;

- 32.2 grams of an unidentified black tar-like substance;

- 67.5 grams of a brown powdery substance suspected to be heroin;

- Laboratory-confirmed 149.2 grams of blue pills containing a mixture of fentanyl, heroin, and tramadol;

- 201 grams of a blue powdery substance suspected to be fentanyl;

- 102.2 grams of white, hard, rock-like substance suspected to be cocaine;

- 127.8 grams of white pills containing an unknown substance;

- 407.6 grams of white pills containing an unknown substance;

- 8.4 grams of a blue powdery substance suspected to be fentanyl; and

- approximately $8,951 in U.S. currency.

***November 18, 2022 – Search Warrant Executions***

99.     On November 18, 2022, DEA and FBI agents executed a series of federal search warrants issued by the Court (the Hon. Kari A. Dooley, U.S.D.J.).

100.     Agents searched WILLIS TAYLOR's residence, 67 Edward Street, 1st floor, West Haven. They seized and located several items of evidence, including (weights include packaging unless confirmatory laboratory tests are noted):

- On the kitchen table, a plastic bag containing a clear white crystal like substance of suspected methamphetamine (40.93 grams); a second plastic bag containing a clear white crystal like substance of suspected methamphetamine (33.87 grams); and a suspected drug ledger;

- On a computer desk, several suspected drug ledgers and **Target Telephone 1**;

- In the living room, .22 caliber ammunition and an Imodium bottle with several blue pills stamped "B974" on one side and "30" on the other;

- In the main bedroom, four pills stamped "R039," .380 ammunition, and a plastic bag containing a clear white crystal like substance of suspected methamphetamine (40.73 grams)

- On Jeanne Taylor (TAYLOR's partner), a bottle with several pills stamped "V" and "48 12" including laboratory-confirmed 10.7 grams of a mixture and substance containing fentanyl, tramadol and heroin;

- In the garage, a chunk of a white substance suspected to be fentanyl; a plastic bag containing a laboratory-confirmed 63.959 grams of a mixture and substance containing methamphetamine; several orange pills containing a laboratory-confirmed 32.489 grams of a mixture and substance containing methamphetamine; plastic bag containing a clear white crystal like substance of suspected methamphetamine (75.71 grams); plastic bag containing a clear white crystal like substance of suspected methamphetamine (33.78 grams); a Ziploc bag with blue colored pills stamped "V" and "48-12," containing a laboratory-confirmed 30.2 grams of a mixture and substance containing fentanyl, heroin and tramadol; a metal grinder labeled "BLU-WHT-BRW" with blue-colored powder residue, and a metal grinder labeled "tangerine lust" with an orange powder residue and

- About $3,765 in cash.

101. During the search of WILLIS TAYLOR's residence, in post-*Mirandized* statements, TAYLOR admitted that there was a pill press at 26 Kendall Street in New Haven, a large industrial building that he was the caretaker of. TAYLOR accompanied agents to that location, signed a written consent to search form, and provided the keys to several locks on the property. In a garage area of the property, agents located a pill press that appeared to be in good working form with a pill punch marked "3 | 0" still in it along with several orange-colored pills. In addition, agents located and seized several Ziplock bags with suspected amphetamine and fentanyl powder residue. Laboratory results received to date include 2.209 grams of actual methamphetamine in a bag of orange powder. As of the date of this affidavit, laboratory results are pending for selected exhibits at this time.

102.    Agents searched 65 Saginaw Trail in Shelton, which had been identified as a "stash house" for WILLIS TAYLOR. There, agents discovered what appeared to be a pill press operation with the following:

- Two pill presses, one with orange powder in the hopper and one with blue powder in its hopper;

- Two pill press punches, one marked "V" and one marked "30";

- Coffee grinder;

- Various items of Tupper wear with powdery residue;

- Two (2) five-kilogram bags of "Firmapress" binding agent; and

- A disassembled .22 caliber revolver.

103.    Agents searched GUMBS residence (21 Batter Terrace, New Haven). In the basement area of the home (where surveillance had previously seen WILLIS TAYLOR and GREATSINGER go to meet GUMBS), agents found and seized (weights include packaging unless confirmatory laboratory tests are noted):

- Several pounds of marijuana in heat-sealed bags;

- A semi-automatic Arcadia Machine & Tool Backup .380 semi-automatic pistol;

- In a dresser drawer, approximately $13,250 of U.S. currency, along with a black Glock model 27 .40 caliber semi-automatic pistol; and two loaded magazines. On top of the same dresser, agents found and seized GUMBS's wallet and Connecticut driver's license;

- Over 1,000 rounds of ammunition throughout the basement of various caliber;

- In the kitchen area of the basement, approximately 1,175.9 grams (with packaging) of suspected binding agent (with laboratory-confirmed no controlled substances);

- Located within the basement area of the residence, within clothing, laboratory-confirmed .906 grams of a mixture and substance containing cocaine.

104.    As of the date of this affidavit, laboratory results for selected exhibits are pending at this time. I have been advised by an ATF Special Agent that the two seized firearms were

manufactured outside of the State of Connecticut, and therefore traveled in interstate or international commerce.

105.     GUMBS is a convicted felon, having been convicted in the Superior Court for the State of Connecticut of Sale of Illegal Drugs in 2011 (sentenced to five years of jail, three years to serve)' Sale of Hallucinogen/ Narcotics in 1998 (sentenced to 12 years of jail, 51 months suspended); Possession of Narcotics in 1996 (sentenced to one year in jail); and Sale of a Hallucinogen/ Narcotics in 1995 (sentenced to seven years in jail, 18 months suspended). Based upon these several prior jail sentences of over one year, GUMBS would know that he, in fact, had previously sustained at least one prior felony conviction.

106.     Agents searched 395 Mansfield Grove, East Haven, the residence of SEAN PEPE. Agents located many items of interest throughout, including (weights include packaging unless confirmatory laboratory tests are noted):

- In the basement, a heat sealed bag with about 250 blue tablets of suspected fentanyl; a plastics bag with a brown/red powder that was later laboratory confirmed to be 1.6 grams of a mixture and substance containing fentanyl; 22 oval tablets that were laboratory confirmed to be 9.06 grams of methamphetamine; 9 pills that were laboratory confirmed to contain 2.3 grams of fentanyl, alprazolam, and cocaine; 50 pills that were laboratory confirmed to contain 11.7 grams of a mixture and substance containing fentanyl; **Target Telephone 2**; approximately $86,138 in United States currency; gold jewelry and a gold Rolex; a loaded Colt .38 special; a loaded L.W. Seecamp Inc. 32 ACP firearm; a loaded 9x18 MAK PA-63 pistol; body armor; dozens of rounds of various caliber ammunition.

- In the garage, two loaded Glock pistol magazines; a tableting machine with white powder residue; and a hydraulic press with a mold (also known as a "kilo press").

107.     I have been advised by an ATF Special Agent that the 9x18 MAK PA-63 firearm was manufactured outside of the State of Connecticut, and therefore traveled in interstate or international commerce.  PEPE is a convicted felon, having been convicted in 2021 of Illegal Possession of a Weapon in a Motor Vehicle (sentenced to three years jail, suspended) for which

his probation was violated in 2022 and he was sentenced to 25 months in jail. Based upon this prior sentence of over one year, PEPE would know that he, in fact, had previously sustained a felony conviction.

108. Following the execution of these search warrants, WILLIS TAYLOR, AQUARIUS GUMBS, and SEAN PEPE were all arrested on state charges.

### B.    MARKOS PAPPAS and DAC

109. Following WILLIS TAYLOR's arrest on November 18, 2022, the investigation continued with respect to MARKOS PAPPAS. That investigation revealed that PAPPAS was attempting to secure hundreds of thousands and dollars of loans for some unspecified business venture, but continued to source and redistribute drugs from/to others. PAPPAS appeared to be dealing with individuals other than WILLIS TAYLOR, likely concerned about TAYLOR's pending criminal charges. PAPPAS has also used ECHEVARRIA to assist him in thwarting law enforcement investigation into his drug-related activities, as described below.

*February 2, 2023 – PAPPAS Obtains a Suspected Kilogram of Cocaine from FAUSEL*

110. LISA FAUSEL was identified as a co-conspirator of PAPPAS in connection with the distribution of kilogram quantities for cocaine. For example, on February 2, 2023, at approximately 9:04 AM, PAPPAS placed a call on **Target Telephone 6** (session 9202 ) to LISA FAUSEL. PAPPAS asked, "Hey, sorry about that. I was on a jail call. I couldn't get off when you were calling . . . Alright, so I'm just calling . . . not to rush you or anything . . . I just wanna' know . . . uh, do you think it will be before 11 o'clock? . . . I wanna' know when I should be prepared for it." FAUSEL responded, "Shit, I don't know. I didn't hear from him. I was hoping it was gonna' be early, you know . . . you know what, let me find out." The two agreed to speak shortly.

111. That same day approximately 9:09 AM, PAPPAS received a call on **Target Telephone 6** from FAUSEL. The following conversation took place:

| PAPPAS: | Hello |
| FAUSEL: | Hey Markos |
| PAPPAS: | Hey |
| FAUSEL: | We are all set |
| PAPPAS: | Okay. You want me to head up? |
| FAUSEL: | Yeah |
| PAPPAS: | Okay, Thanks |
| FAUSEL: | Alright. Okay bye. |

Previous intercepted conversations between FAUSEL and PAPPAS were of the same content, scheduling a time to meet. Based upon this history and the two calls intercepted on the morning of February 2, investigators believed that PAPPAS was arranging to pick up a quantity of controlled substances from FAUSEL who, in turn, was waiting on someone to deliver them to her. FAUSEL then called PAPPAS to confirm that she had to drugs. Investigators had previously spoken to Devon Motel management and identified Lisa FAUSEL as staying in room number 12. Recent surveillance and **Target Telephone 6** pings indicated that PAPPAS visited FAUSEL at this location on January 26 and 30, 2023.

112.  On February 2, 2023, investigators established stationary surveillance in the area of the Devon Motel prior to PAPPAS's arrival. At approximately 9:31 AM, a grey Lincoln SUV, known to be driven by PAPPAS, arrived at the Devon Motel. PAPPAS was observed exiting his vehicle and walking towards room number 12. Investigators could not see which unit PAPPAS entered based on the vantage points available.

113.  At approximately 9:51 AM, PAPPAS was observed walking away from room 12 with a paper bag in his hands. PAPPAS was not observed exiting a specific unit, however, he was

observed exiting from an area which would have only been unit 11 or unit 12. PAPPAS entered his vehicle with the paper bag in his hands and left the area.

114.    PAPPAS's vehicle then entered the on-ramp for route 95 north. At approximately 10:01 AM, PAPPAS's vehicle was stopped by a Connecticut State Trooper for a traffic violation in the area of exit 41.

115.    At approximately 10:32 AM, during the traffic stop, **Target Telephone 6** received an incoming call from a male later identified as JULIO ECHEVARRIA. ECHEVARRIA is known to law enforcement as a Latin King member, and also designated as a gang member by Connecticut Department of Corrections. The following conversation took place:

| | |
|---|---|
| PAPPAS: | Aight, I'm taking off |
| ECHEVARRIA: | You good? |
| PAPPAS: | No. I'm 'bout to…I gotta go…where you at? |
| ECHEVARRIA: | I'm at the hotel |
| PAPPAS: | Aight, I'ma come to the hotel and get you…you take me to the police station. I had a stop, then I took off. Uh…uh…I wasn't comfortable with how that was going. Um…I'ma pick you up, you take me to the police station. I turn myself in and [U/I] |
| ECHEVARRIA: | I got you |
| PAPPAS: | And um… [Voices Overlap] |
| ECHEVARRIA: | I got you [U/I] |
| PAPPAS: | Get the bondsman ready for me |
| ECHEVARRIA: | Aight, give me like two minutes. |
| PAPPAS: | I'm right around the corner. I'm 'bout to come [Voices Overlap] |
| ECHEVARRIA | I'm getting…I'm getting dress now. |
| PAPPAS: | Aight |

116.    Investigators learned that PAPPAS fled from Connecticut State Police during the traffic stop ("…I had a stop, then I took off. Uh…uh…I wasn't comfortable with how that was going."). Investigators also believed that in the calls to ECHEVARRIA, PAPPAS provided information as to where he was heading ("…I'ma come to the hotel and get you..") indicating that it was a "hotel." Investigators believe that PAPPAS had drugs in the paper bag that he took from FAUSEL's room at the Devon Motel and further believe that PAPPAS fled the traffic stop to conceal those drugs and then turn himself in to police ("…you take me to the police station. I turn myself in.").

117.    On the same date at approximately 10:37 AM, PAPPAS made an outgoing call from **Target Telephone 6** to ECHEVARRIA (session 9221), the following conversation took place:

| | |
|---|---|
| ECHEVARRIA: | I'm done getting dressed up. [U/I] lobby in two minutes. |
| PAPPAS: | I'm right here by your car. |
| ECHEVARRIA: | Alright |
| PAPPAS: | Gotta, gonna' give you something real quick. |

118.    I believe that PAPPAS called ECHEVARRIA when PAPPAS had arrived at the complex where ECHEVARRIA was living to further advise that he had to give something to him prior to ECHEVARRIA taking PAPPAS to the police station ("Gotta gonna give you something real quick."). I believe that PAPPAS was giving the drugs to ECHEVARRIA to conceal prior to ECHEVARRIA bringing PAPPAS to the police station. According to toll records, immediately following this telephone call with PAPPAS, ECHEVARRIA made four phone calls to another Latin King member, known to me. ECHEVARRIA then made one call to another known Latin

King member, Willie Thompson, who lives in an RV at DAC and appears to manage much of PAPPAS's business ventures at DAC.

119.    Pen and ping and Court-authorized GPS location information on **Target Telephone 6** was received at 10:38 AM, indicating that PAPPAS was in the area of 40 Sargent Drive in New Haven, the New Haven Village Suites. Investigators responded to the area of the New Haven Village Suites on this date in anticipation of PAPPAS fleeing to that area. Investigators observed PAPPAS's vehicle unoccupied. At approximately 10:48 AM, investigators at this location observed PAPPAS in the parking lot having come from an unknown apartment. PAPPAS entered a vehicle with two other individuals, one of who was recognized by investigators as ECHEVARRIA. Law enforcement personnel were able to stop the Jeep and detain PAPPAS until he was taken into custody by Connecticut State Police for fleeing the traffic stop.[6] Investigators were unaware at that time that ECHEVARRIA had made telephone calls to two other known gang members in what is now believed to have been an attempt to further conceal the contraband passed to ECHEVARRIA from PAPPAS.

120.    Investigators on scene at the New Haven Village Suites observed the historical surveillance video footage for this location in attempt to determine the unit number that PAPPAS entered and exited. Enhanced surveillance footage shows PAPPAS exiting his car with what appears to be a rectangle-shaped object tucked underneath his hooded sweatshirt.  At the time indicated on this surveillance video, as indicated above, PAPPAS was intercepted on **Target Telephone 6.** PAPPAS told ECHEVARRIA, "I'm right here by your car" and, "Gotta, gonna' give you something real quick."

---

[6] ECHEVARRIA posted the $2,000 cash for PAPPAS's bond.

121.    PAPPAS then ascended an outdoor staircase that leads only to apartments 321 and 322. On that staircase, he meets with an individual believed to be ECHEVARRIA and the two interact briefly. It appears that PAPPAS manipulated his sweatshirt in some fashion and ECHEVARRIA did the same. ECHEVARRIA then went back up the stairs and PAPPAS followed a few moments later. PAPPAS is then observed on the surveillance footage exiting down those same steps just prior to investigators observing him in the parking lot but appeared to no longer have the rectangle-shaped objected concealed under his sweatshirt. A few minutes later, ECHEVARRIA and his girlfriend came down the stairs to drive PAPPAS to the police station. Management at the New Haven confirmed that ECHEVARRIA currently lives in unit 322 but had rented multiple units in the past.

122.    Based upon the calls set forth above and the actions of PAPPAS on February 2, 2023, investigators believe that PAPPAS brought the drug quantity from his vehicle to this apartment when he went inside based on the conversation. PAPPAS's car, which was still parked at the New Haven Village Suites, was seized by the FBI as evidence and in anticipation of a search warrant application. A West Haven Police Department K-9 trained in detecting illegal narcotics was then brought to the New Haven Village Suites, was run around the perimeter of the car, and then alerted to the presence of narcotics on the pillar between the driver side front and rear seats.

123.    Later on February 2, 2023 around 12:00 PM, investigators went to Room 12 of the Devon Motel and knocked on the door. Lisa FAUSEL answered the door and invited the investigators to come in the room, after investigators identified themselves as law enforcement. FAUSEL stated that "Markos" just left her room and that he took a paper bag that he had dropped off to her several days earlier. FAUSEL stated that the bag was kept in a Styrofoam cooler with nothing else. FAUSEL claimed that she did not know what was in the paper bag. FAUSEL allowed

agents to take the Styrofoam cooler outside of the room, which investigators did. A West Haven Police Department K-9 trained in detecting illegal narcotics was then brought to the motel and alerted to the presence of narcotics on the container.

124.    Based on these circumstances, search warrant applications were presented to the Court for FAUSEL's motel room, ECHEVARRIA's apartment, and PAPPAS's vehicle. On February 3, 2023, the Court, the Hon. Maria E. Garcia, United States Magistrate Judge, issued the three search warrants.

125.    The Court-authorized search of FAUSEL's hotel room revealed a kilogram of a white powdery substance, which laboratory results confirmed was 832.5 grams of a mixture and substance containing cocaine; approximately $94,500 cash, and two clear plastic bags containing hundreds of blue pills, which laboratory results confirmed contained 43.989 grams and 171.989 grams, respectively, of mixtures and substances containing fentanyl. Based on my training and experience, I recognized these pills as resembling Oxycontin. Investigators suspect the pills to be counterfeit pills containing fentanyl based on their non-uniform appearance and experience in this investigation. Following the search of the motel room, FAUSEL was advised of her *Miranda* rights, agreed to speak with agents, and was interviewed.  She again reiterated that she did not see what was in the brown paper bag with which PAPPAS left her hotel room, but she suspected it to be "drugs."

126.    A search of ECHEVARRIA's apartment at the New Haven Village Suites (unit 322) was negative for contraband. Investigators believe that ECHEVARRIA and/or others were able to secrete the suspected kilogram that PAPPAS handed off to him in a different location prior to the execution of the search warrant. A search of PAPPAS's vehicle revealed visible residue on the center console of the car that filed-tested positive for the presence of fentanyl.

127.    As set forth above, numerous surveillances of the co-conspirators like WILLIS TAYLOR, GORDON LAURIA, and MARKOS PAPPAS have seen them meeting with one another and others at Discount Auto & Cycle, LLC ("DAC"), a purported legitimate retail automotive business run by PAPPAS. On November 29, 2021, PAPPAS registered "Discount Auto Center Limited Liability Company" with the State of Connecticut, Secretary of State, and later changed the name to "Discount Auto & Cycle LLC" on March 15, 2022, with an address of 376 Quinnipiac Ave, in New Haven. PAPPAS is listed as the Managing Member and sole principal of the business. On February 14, 2023, according to Secretary of State records, PAPPAS legally changed the name of the business again from Discount Auto & Cycle to "Pappas Motors LLC."[7]

128.    According to public property records, DAC was purchased by PAPPAS from Anthony Depaola on January 31, 2022, for $265,000 with a down payment of $100,000. The lien holder is Anthony Depaola. According to the State of Connecticut Department of Labor, DAC and/or PAPPAS have not reported any wages or earnings paid to any employees for last 12 quarters. A review of PAPPAS's checking account show no obvious records related to payroll expenses.

129.    While DAC holds itself out as a retail business offering automotive services, electronic surveillance via pole cameras reveals that the location does not operate like a typical business. For example, much of the activity at the location takes place outside of business hours. In addition, the amount of foot traffic at the business is not consistent with a normal repair shop or retail location. Individuals that do enter the storefront portion of the business typically stay for short periods of time, do not appear to be getting work done on their vehicles, and are not seen leaving with products that one would expect from an automotive retail location. Investigators have

---

[7] The business will still be referred to "DAC" throughout.

identified several instances where "employees" of DAC did not have the skill set to perform work consistent with an automotive repair store. For example, calls intercepted over **Target Telephone 6** revealed that employees did not know how to use the credit card machine to process a transaction. In addition, during physical surveillance, an employee was seen struggling when attempting to put a car on a DAC tow truck.

130.    Intercepted calls over **Target Telephone 6** have also revealed that individuals refer to DAC as the "club house," and "den number 1," an apparent reference to PAPPAS's association with the Latin Kings gang and its affiliated Uncaged Lions motorcycle club. Investigators have observed what appear to be social gatherings of the Latin Kings and Uncaged Lions members at DAC. Two individuals with close ties to PAPPAS, Willie Thompson and Robert Ruiz, also appear to live in mobile homes parked in the back parking lot of the business and appear to be "security" for DAC. Thompson and Ruiz have been observed in photographs wearing "Uncaged Lions," motorcycle vests with a patch that reads "Heavy Hitter." Investigators know through training and experience that motorcycle clubs designate positions such as Treasurer, President, Vice-President, and "Enforcer." Enforcer usually refers to personnel who handle security issues, weapons for the gang members, and other types of enforcement in furtherance of the gang.

131.    Investigators have intercepted calls between PAPPAS and Thompson confirming this role for Thompson. For example, on October 22, 2022, Thompson and PAPPAS had a conversation indicating Thompson would be carrying a weapon to a Waterbury club. PAPPAS received a text from Thompson on this date at 11:17 PM (session 3278) saying, "I don't want to be pat down." Minutes later, PAPPAS responded, "Ok hold I'll have him call you on signal" (session 3280). Investigators suspect that PAPPAS was going to arrange for Thompson to avoid a pat down so that he could take a weapon into the club.

132.     In another call on November 2, 2022, (session 6026) at 12:32 PM, PAPPAS told Thompson to meet him at Home Depot in East Haven adding, "Yeah. We got, we got money to collect over there . . . ." Investigators suspect this is another example of the role of the "Enforcer," which may include assisting on debt collections.

133.     The financial investigation into DAC reveals details that are inconsistent or at odds with a traditional retail operation. For example, bank records received to date show that PAPPAS appears to have structured his cash deposits into his account at Citizens on four occasions over a two and a half month period to avoid reporting requirements triggered by deposits in excess of $10,000:

| Date | Transaction Type | Amount Deposited | Time of Deposit | Branch Number |
|---|---|---|---|---|
| 9/20/2022 | Cash Deposit | $4000.00 | 9:20AM | 022726 |
| 9/20/2022 | Cash Deposit (ATM) | $1160.00 | 12:36PM | ATM # CN2162 |
| 9/20/2022 | Cash Deposit (ATM) | $800.00 | 7:55PM | ATM # CN2162 |
| 9/21/2022 | Cash Deposit | $4,300.00 | 11:52PM | 022726 |
| 11/2/2022 | Cash Deposit | $7,000.00 | 12:35PM | 022726 |
| 11/3/2022 | Cash Deposit | $4,420.00 | 12:11PM | 022726 |
| 11/3/2022 | Cash Deposit | $7,000.000 | 1:27PM | 022726 |
| 11/16/2022 | Cash Deposit | $6,800.00 | 1:12PM | 022726 |
| 11/17/2022 | Cash Deposit | $6,000.00 | 10:38AM | 022726 |
| 11/18/2022 | Cash Deposit | $1,775.00 | 2:38PM | 022726 |
| 12/5/2022 | Cash Deposit | $4,000.00 | 10:06AM | 022726 |
| 12/5/2022 | Cash Deposit | $2,100.00 | 11:35AM | 022726 |
| 12/8/2022 | Cash Deposit | $6,000.00 | 10:39AM | 022726 |

A search of DAC records would reveal if these cash deposits are supported by business records that one would expect at a retail location, including receipts and invoices.

134.    PAPPAS is the sole signatory on the Citizens Bank account (-7017) summarized above and appears to be commingling the money in the account for both business and personal expenses (including expenses associated with his illegal drug trafficking). According to bank records, PAPPAS deposited the following cash and credit card deposits into this bank account during 2022:

- Cash Deposits: $258,313.00
- Credit Card Deposits: $56,176.81

For the month of January 2023 Pappas deposited:

- Cash Deposits: $9,390.00
- Credit Card Deposits: $4,868.79

135.    Based on law enforcements training and experience it is typical for businesses like DAC to have the majority of their business income obtained through credit card purchases and a smaller amount of their income coming from cash purchases. An analysis of PAPPAS's records reveal the opposite.

136.    Bank records for this account show additional structuring-type deposits of $7,000 on November 2, 2022, $4,420 and $7,000 on November 3, 2022. These are significant because they are around the time of significant drug transactions and related telephone calls.

137.    For example, on November 2, 2022, at approximately 12:27 PM (session 6019) PAPPAS texted FAUSEL, "Need to see you for Glen and Alex." FAUSEL and PAPPAS exchange text messages shortly thereafter agreeing to meet around 3:00 PM on this date. As set forth above, investigators have established that FAUSEL is a drug supplier to PAPPAS. After meeting with FAUSEL, PAPPAS then made the call to Thompson, referenced above, indicating that PAPPAS

and Thompson had to "collect money" from someone they were meeting at Home Depot. Investigators suspect that PAPPAS looks to sell the product procured by FAUSEL as soon as possible after purchasing to minimize the time he is in possession of the contraband. Investigators also believe this to be why cash deposits into PAPPAS's account (the following day) often coordinate with large drug purchases. Although he is not often withdrawing cash to make the drug purchases, he seems to use the proceeds to deposit into the business account, thus laundering it.

138.    As another example, in between intercepts, toll records indicated that PAPPAS was in contact with FAUSEL seven times (five calls/two text messages) on November 9, 2022, the same day he made a cash deposit of $6,542. PAPPAS was again in contact with FAUSEL seven times (four calls/three text messages) on November 16, 2022, the same day he made a cash deposit of $6,800. As a third example, in between telephone intercepts, PAPPAS was in contact with FAUSEL four times (three calls/one text message) on November 22, 2022, the same day that he made a cash deposit of $7,000. There are numerous days that PAPPAS is not in contact with FAUSEL, thus investigators find these occurrences to be correlative.

139.    In addition to evidence concerning the money laundering investigation, there is probable cause to believe, and I do believe, that there is evidence of drug trafficking at DAC. As discussed herein, co-conspirators like WILLIS TAYLOR have been seen with frequency at DAC in connection with suspected narcotics transactions with PAPPAS, like on October 13, 2022, described above, and on October 20, 2022, set forth above.

140.    PAPPAS also meets other individuals at DAC to conduct narcotics transactions. For example, on or about November 1, 2022, at approximately 12:29 PM, PAPPAS received a text message on **Target Telephone 6** from an individual identified as Jose Bonilla, another known

Latin King member and CT DOC designated gang member, (Session 5823) that read, "Bro hit me

when u can." PAPPAS then called Bonilla back on the same day at 1:56 PM (Session 5831):

> Bonilla: Bro! [Pause] How you doing?
>
> PAPPAS: Alright. What up, bro?
>
> Bonilla: Yeah. Nay uh, I need, we had, um [Clear Throat] I need to holla at you but not through here. Then, I got a order so… whenever you could get some time and shit. And put it aside.
>
> PAPPAS: Come by the shop. I'm at the shop now.
>
> Bonilla: Yeah but I got, I'm on the run right now. Just code [P/H] it. I gotta go like five miles and, and back. How long you gonna be there? Couple of hours?
>
> PAPPAS: Just call me when you're, when you're back. Getting, getting back.
>
> Bonilla: Alright, my brother. [Short Pause] Alright bye. [Voices Overlap]
>
> PAPPAS: Alright

141. I believe, based on my training and experience and familiarity with the

investigation, that when Bonilla told PAPPAS he wanted to "order" something and asked PAPPAS

to "put it aside" for him that Bonilla was requesting to obtain narcotics from PAPPAS.

142. Later, at approximately 5:05 PM, Bonilla texted PAPPAS on **Target Telephone 6**,

"U at da shy" (Session 5896), "shop" (Session 5897). PAPPAS responded, "No I left. Gotta do

something. Call you when I'm done and see where you at. I'll be near your crib if that's where

you gonna be." Based on my training and experience, I believe these text messages are indicative

of efforts to confirm a meeting time and place for PAPPAS and Bonilla and that the reference to

"shop" is to the DAC garage.

143. Later that night at approximately 6:03 PM, PAPPAS, utilizing **Target Telephone

6**, texted Bonilla (Session 5909), "here" while surveillance observed PAPPAS near Bonilla's

known residence on Woodward Avenue in New Haven. Bonilla responded by calling PAPPAS

(Session 5911). The two then discussed that Bonilla was on his way home to meet PAPPAS.

However, at 6:08 OM, PAPPAS texted Bonilla (Session 5916): "Make [sic] me by the shop I can't sit here" At 6:14 PM, pole camera footage showed that PAPPAS arrive back at DAC in his truck. I believe this is consistent with PAPPAS telling Bonilla , "[Meet] me by the shop" in the above text messages, indicating that PAPPAS did not want to wait at Bonilla's house and that Bonilla instead should come to DAC. Bonilla then arrived in a Honda sedan.

144.    At DAC, Bonilla and PAPPAS greeted with a hug and then walked around the building out of view. At approximately 6:23 PM, both parties returned into view of the officers conducting surveillance and Bonilla appeared to be holding an object in his left hand, which he then concealed in his coat pocket. Based on Bonilla's intention to avoid discussing the reason for him meeting with PAPPAS ("I need to holla at you but not through here"), Bonilla's need to order something from PAPPAS ("I got a order so... Whenever you could get some time and shit. And put it aside"), PAPPAS's contention that he was uncomfortable waiting in one spot for very long ("Make me by the shop I can't sit here"), followed by the brief meeting between PAPPAS and Bonilla where Bonilla left with an object, I believe that a drug deal took place at DAC.

145.    Throughout the investigation, law enforcement have observed what they believe are hand-to-hand drug transactions in and around the DAC property. For example, on February 24, 2023, at approximately 5:30 PM, officers observed a black Lincoln sedan  drive into camera view from the rear of the DAC property. The Lincoln parked in front of the locked wire gate within the property. The driver, identified as Robert Ruiz,[8] exited the Lincoln. Ruiz unlocked the gate and returned to the Lincoln. Ruiz then opened the rear passenger door and the trunk of the Lincoln. Ruiz leaned into the rear passenger compartment and retrieved a black winter coat. Ruiz returned

_____

[8] Ruiz has the multiple felony criminal convictions in the State of Connecticut including (05/24/2017) Criminal Possession of a Controlled Substance; (07/12/2016) Possession with Intent to Sell Controlled Substances; and (11/19/2004) Assault 2.

to the trunk area briefly before sitting in the driver seat. At approximately 5:20 PM a silver Honda sedan arrived at DAC through the now-open gate. The Honda parked window to window with the Lincoln and lowered the window.

146.     At approximately 5:21 PM, Ruiz extended his arm out of his driver side window, holding a weighted, clear plastic bag, containing some white substance. The Honda driver, later identified as Edgardo Cardona,[9] extended his arm out of his driver window and took the bag from Ruiz. Then, the front seat passenger of the Honda, described as a white male, exited and walked toward the Lincoln and out of camera view. The rear passenger of the Honda, described as a Hispanic male, exited and entered the front passenger seat.



147.     At approximately 5:22 PM, the Honda drove forward and parked in a marked parking space in front of the front door to DAC. The Lincoln then departed DAC through the front gate. Cardona then exited the Honda. Cardona walked towards the rear of DAC and out of camera view. At approximately 5:25 PM, Cardona walked back into camera view and returned to the

---

[9] Cardona has the convictions in the State of Connecticut that include: (05/06/2022) Assault 2; (03/26/2021) Possession of Controlled Substance; and (01/17/2013) Possession with Intent.

Honda. Cardona opened the driver door, sat down. Moments later he exited, grasping an object in his left hand. Cardona then walked into DAC. As he walked, Cardona's left arm did not swing, as if he was carrying something in his hand. At approximately 5:26 PM, Cardona exited DAC and returned to the Honda carrying, what appeared to be a white envelope in his right hand. At this time, an unknown subject, exited DAC. Due to the angle of the camera, the unknown subject was only visible from the knees down. This party walked off camera toward the rear of the DAC property.

148.    At approximately 5:27 PM, Cardona drove the Honda and departed the area. Investigators believe that drugs were exchanged and Cardona brought those drugs into DAC. Cardona, Thompson and Ruiz have all been observed inside DAC after hours and on the weekends. Thompson and Ruiz have been observed inside DAC at 1:00 and 2:00 AM on the weekends as well. Investigators believe this shows these individuals to use the premises for purposes outside of the automotive business. Investigators believe they may store drugs and other contraband inside.

149.    On December 26, 2022, East Haven Police observed Thompson as a passenger in the same Lincoln sedan mentioned above, that is usually driven by Ruiz. East Haven Police knew Thompson to have a warrant and followed the vehicle, catching up to it in the area of DAC. Thompson exited the vehicle to unlock the parking lot gate at DAC when police were able to catch up with the vehicle. Thompson fled on foot behind DAC and out of sight briefly, before being apprehended. Ruiz was taken into custody on an unrelated warrant. Thompson was found to be in possession of a small amount of crack cocaine. A nine millimeter round of ammunition was also located in the vehicle.

150.    Throughout this investigation, it has become clear that Thompson is living in a pull-behind RV trailer located in the rear of the building. (Ruiz is believed to be living in another pull-

behind trailer on an adjacent lot also owned by PAPPAS). Thompson has been observed going to and coming from the RV at all times of the day, to include during DAC business hours. Investigators know Thompson to be acting as DAC employee based on his constant presence at the business, caretaking the grounds (i.e., leaf blowing), interacting with DAC customers, unlocking and opening the parking lot gate daily, and phone call intercepts indicating that he is taking direction from PAPPAS. Thompson, too, seems to be an intricate part of the activities at DAC. For this reason, investigators believe that the RV is likely to contain additional records or documents that prove or disprove the large quantity of cash transactions associated with DAC being associated with money laundering. Investigators also believe that the RV is likely to be a storage place for one or more firearms and drugs given Thompson's position as "enforcer" and recent history of drug possession. Pole camera footage has shown Thompson and others going back and forth to the RV and other outbuildings during and outside of DAC business hours.

151.    For example, on March 13, 2023, pole camera footage showed Cardona arrive at DAC. Thompson came up to Cardona in an apparent greeting. Cardona then exited his vehicle with a white object in his hand. Cardona walked to the RV and returned shortly thereafter with nothing in his hands. As noted above, Cardona has a criminal history of drug-related charges.

152.    On March 19, 2023, at approximately 3:55 PM electronic surveillance captured a tan van pull into the DAC parking lot and park behind the main building of DAC near Thompson's RV. Thompson came from the area of the entrance to the RV with large suitcases loaded onto a luggage cart. Thompson appeared to load these into the van and then returned the empty luggage off-camera near the entrance of the RV. Thompson then entered the front passenger seat of the van and the van departed. At about 7:11 PM that same night, the tan van returned and Thompson again used the luggage cart and transported the suitcases back to the entrance of the RV. I believe that

the movement of two large suitcases within a three-hour period is unusual and inconsistent with travel or the purported work being done at DAC (automotive repair) and therefore believe that the suitcases may have concealed some type of contraband.

153.    In addition, investigators have observed other employees/gang members utilizing the RV. Ruiz has been observed going to and from the RV.[10] As mentioned above, when PAPPAS provided suspected drugs to Bonilla, they both walked around the back of the building where a transaction for drugs seemed to take place. Given the time of night and vantage point, it is unclear if they went to the back door of DAC, a storage container, or the RV to retrieve the item. Investigators believe that any storage container and/or RV on the DAC premises may contain evidence of drug dealing activity and money laundering to include drugs and paraphernalia, cash, drug ledgers, financial documents, business records, etc.

154.    Through DAC, PAPPAS seems to employ ten or more people, at least five of who have been identified as Latin King and/or Uncaged Lions members. There exists no Department of Labor records for these employees, no tax returns either individually for PAPPAS or for the business over the last 12 quarters, limited legitimate apparent automotive-related business activity at DAC, and large amounts of cash deposits and withdrawals in a business banking account. Given these results of the investigation as well as the drug transactions involving PAPPAS directly and/or his subordinates, investigators believe that fruits of these crimes and possibly more will be located on the property of 376 Quinnipiac Avenue in New Haven.

## V.    CONCLUSION

155.    As set forth above, there is probable cause to believe, and I do believe, that the individuals identified above in paragraphs 4(a) through 4(n) have committed violations of the

---

[10] Vantage points do not allow observing when individuals enter the RV, but only their walking to an area where entering the RV would be the only likely reason to be in that area of the property.

federal laws identified above, and therefore respectfully request the issuance of arrest warrants and criminal complaints.

156. In addition, I believe that there is probable cause to support the issuance of a search warrant for DAC pursuant to Federal Rule of Criminal Procedure 41.

Respectfully submitted,

Dana Mofenson
Special Agent
Drug Enforcement Administration

Subscribed and sworn before me in New Haven, Connecticut, on March 24, 2023

HON. ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

Discount Auto & Cycle (DAC) is located at 376 Quinnipiac Avenue in New Haven, Connecticut. This address abuts an open lot located at 392 Quinnipiac Avenue, both of which are owned by Markos PAPPAS. DAC is a commercial business advertising automotive and motorcycle repairs. Both addresses are zoned as industrial land. The open lot does have a barrier from 376 Quinnipiac Avenue and is used by both customers and employees of DAC for vehicle traffic, parking and storage containers. The combined land coverage is 1.37 acres. There is one main L-shaped building that contains a storefront area to the left as you look at the building and attached garages accessed by two yellow garage doors, and approximately thirteen related structures including five 40-foot shipping containers, two pull-behind RVs, four tent-style garage bays, a double-wide office-type trailer.



**Front of DAC Main Building and Shipping Containers**



**Rear of DAC Main Building and Tent-Style Garage Bays and Pull-Behind RVs**

A

## ATTACHMENT B

### Particular Things to be Seized

The following items evidencing violations of, violations of 21 U.S.C. §§ 841(a)(1) and 846 (Conspiracy to Distribute and to Possess with Intent to Distribute and Distribution of Controlled Substances) and 18 U.S.C. 1956 (Money Laundering):

1. Any controlled substance (all of which could be in any form) and items containing residue of controlled substances;

2. Paraphernalia used and commonly associated with the possession and distribution of controlled substances, including, but not limited to: scales, packaging materials, including plastic baggies, plastic or glass vials, heat sealing machines, pipes, grinders, funnels, presses, pill punches/dies, sifting screens and/or strainers, and any materials used for "cutting" or diluting controlled substances;

3. Any books, records, receipts, notes, ledgers, journals, travel documents, and other papers relating to the purchase and distribution of controlled substances;

4. Bank statements, tax records, financial statements and records, safe deposit keys, storage unit keys, receipts, and other books and records, including any related to the purchase of real property and personal property (including automobiles, boats, jet-skis, snowmobiles, motorcycles and all-terrain vehicles), and, in general, any records or documents evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances;

5. United States currency, stocks, bonds, certificates of deposit, any other financial instruments, money counters, and the contents of any safes or other security type boxes or locked boxes and containers, including any jewelry, precious metals and gems, such as gold, silver and diamonds evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances;

6. Business receipts, invoices, records of accounts payable and receivable, and general ledgers;

7. Records of any communications relating to drug trafficking; and

8. Firearms and ammunition.

B